**PACCON, INC.**
v.
**The UNITED STATES.**
No. 306–61.

United States Court of Claims.
July 17, 1968.

David V. Anthony, Washington, D. C., for plaintiff; Gilbert A. Cuneo, Washington, D. C., attorney of record. John

M. Allen and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE AND FOUR AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THOSE COUNTS

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge.*

These cross-motions for summary judgment present for review two board of contract appeals decisions on two separate contracts held by the plaintiff. The first claim, set forth in Count 1 of the petition, challenges a determination of the Armed Services Board of Contract Appeals (1963 BCA ¶ 3686 and ¶ 3796), affirming, after *de novo* review on the lower board's record, an earlier decision of the United States Army Japan Board of Contract Appeals (USARJ BCA No. 59). The second claim, in Count 4, attacks a ruling of the Japan Board on another matter (USARJ BCA No. 70).[1] We consider Count 1 in Part I and Count 4 in Part II.

I

The Count 1 claim is for the cost of delays allegedly caused by the failure of the Government to coordinate the operations of a separate contractor, Shimato Construction Co., Ltd. (Shimato), with those of plaintiff so as to avoid interference by Shimato with Paccon's performance. The issues are: (1) Did the Government's assurances to plaintiff prior to award, or any explicit or implicit provision of the contract, constitute a warranty that the work of Shimato would not delay or interfere with plaintiff's performance? (2) If not, did the Government undertake an obligation which was less than a full warranty and was this obligation violated? And (3) in any case, do the waivers which plaintiff executed bar this delay claim?

The preliminary facts are not in dispute. At the end of June 1954, the Corps of Engineers awarded a fixed-price contract to plaintiff for the construction of 128 houses at two sites, Sada (77 houses) and Futema (51 houses), in Sukiran, Okinawa, for an estimated contract price of $1,856,100. The first house was to be completed 150 days after receipt of the notice to proceed, with subsequent completions due one-a-day thereafter. Plaintiff's contract covered only the construction of the houses and the pads on which they stood. A separate award was to be made for site grading, utilities, roads, and sidewalks. Plaintiff's ability to meet its completion schedule depended on the timely grading of the sites and installation of utilities, roads, and sidewalks since the sites had to be graded before construction of the houses could start.

Paccon was aware at the time of negotiating the contract that no final site had been fixed for the contemplated construction other than it would be generally at Sukiran. It also knew that negotiations were simultaneously being conducted with Shimato for the site grading, roads, and utilities systems by an "Island-Wide" contract for such work at Sukiran and elsewhere on Okinawa. The "Island-Wide" contract was awarded to Shimato on June 30, 1954, simultaneously with the award of plaintiff's

---

* We are indebted to Trial Commissioner C. Murray Bernhardt for his opinion. We have incorporated portions of it in Part I of the court's opinion though we come to partly different results. Part II (which both parties accept) is wholly the commissioner's, with a slight modification by the court.

1. This latter decision of the Japan Board was not reviewable by the ASBCA because less than $50,000 was involved.

The other three counts in the petition have been settled administratively. The petition was filed before the decisions by the boards of contract appeals.

contract. Both this and the plaintiff's contract provided:

Article 12. *Other Contracts.* The Government may undertake, or award other contracts for additional work, and the Contractor shall fully cooperate with such other contractors and Government employees and carefully fit his own work to such additional work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or by Government employees.

Shimato's "Island-Wide" contract provided in addition:

SC-3F Priority of Work: Since Contractor is to supply roadways, drainage facilities and utilities for structures to be built by others, it will be necessary to coordinate installation of items under this contract with the expected times of completion for these structures in order that the structures and appurtenant roads, drainage facilities and utilities may be completed at approximately the same time. The priority for commencement and completion of each portion of each lot will be established by the Contracting Officer and contractor shall commence work at such time and in such places as the Contracting Officer shall direct.

Plaintiff received a notice to proceed on October 13, 1954, and shortly thereafter was given a copy of Shimato's contract. Prior to receiving the notice to proceed the plaintiff was informed by the Government that Shimato would be unable to complete the site grading at the Sada site without causing a delay to plaintiff, and the contracting officer requested plaintiff to perform Shimato's contract grading at the Sada site at Shimato's unit prices. The plaintiff did so under a modification of its own contract, and completed its obligations at Sada within the allowed time. Not so at Futema.

Soon after the plaintiff received its notice to proceed it became apparent that, at its then rate, Shimato was not going to discharge its site grading responsibilities at Futema in time to permit plaintiff to proceed with its construction schedule. On October 22, 1954, one week after the modification had been executed transferring to plaintiff Shimato's responsibility for site grading at the Sada area, the Government requested plaintiff to submit a quotation for performing Shimato's site grading and certain other work at Futema. The plaintiff supplied a quotation for this work but did not receive the job.

As a result of Shimato's failure to make satisfactory progress at Futema, conditions there became progressively worse. Shimato's late commencement of operations, the slow pace of its work, and its method of operations (such as leaving ditches standing open and backfill uncompacted) impeded plaintiff's access to the worksite and interfered with its work, as well as increasing its costs of performance. Plaintiff frequently and vigorously complained to the Government about the delays and interference it was experiencing from Shimato's indiscriminate performance without regard for priority schedules, and asked the Government to take appropriate corrective action. For example, in its letter of February 14, 1955, to the contracting officer the plaintiff stated:

* * * the other Contractor has failed to complete "necessary grading and compaction to prepare house sites to necessary grades" insofar as any of such work being performed by the other Contractor is concerned. Specifically, due to such failure to perform, we have been unable to place base course building pads and to proceed with structural work on any of the building sites where the other Contractor is performing grading work. * * *

\* \* \* \* \* \*

As in the Sada Area the other Contractor has performed work indiscriminately throughout the [Futema] area without regard to priority schedules, leaving ditches open indefinitely,

rendering areas inaccessible or hazardous to work in. * * *

In none of these complaints to the Government did the plaintiff refer to the Government's responsibility under its alleged warranty, later asserted before the Boards and here.

On June 9, 1955, the plaintiff informed the Government that "[i]n order to meet the proposed schedule, certain work being performed by others must be accomplished well in advance of turnover dates", referring to the connecting of utilities, completion of sidewalks, and backfilling and compaction of ditches. In reply to plaintiff's letter of August 22, 1955, complaining of Shimato's delays which were resulting in excessive contract costs to plaintiff, the Government's letter of August 24, 1955, stated in part:

> The Contracting Officer knows of no guarantee, stated or implied, that you would be given paved entrance and exit to your building at any given stage of construction.

> The Contracting Officer cannot agree to have the work done by others performed in the sequence you desire, nor does your contract state that work by others will be done as you desire.

Following a conference on August 27, 1955, attended by the interested parties to discuss mutual interference problems between plaintiff and Shimato, the Government on September 12, 1955, furnished plaintiff a schedule showing revised completion dates for utilities and paving, as well as revised turnover dates of the houses at Futema (and Sada). These dates were predicated on the completion schedule submitted by Shimato, and the communication ended: "Maximum effort will be made to meet the above schedule." Although Shimato promised to be completed at Futema by December 15, 1955, on May 24, 1956, the Government informed the plaintiff that Shimato would not complete all utilities until June 8, 1956. By January 27, 1956, the plaintiff had completed 97 percent of its contract, but delays by Shimato prevented final completion and turnover by plaintiff until July 13, 1956, or 154 days late. The extent to which change orders and the plaintiff itself may have contributed to this delay need not be considered at this stage of the litigation. Time extensions were granted plaintiff matching the delays.

On October 22, 1957, plaintiff submitted a formal claim to the contracting officer requesting that a modification be issued to compensate it for its increased costs "brought about by delays on the part of the utilities contractor in the performance of his work." These claimed costs totaling $169,200 [2] consisted of increases in overhead ($115,000), labor ($44,000), and building maintenance ($10,200). On February 20, 1958, the contracting officer denied plaintiff's claim on the ground that it had been waived by plaintiff by the execution of the waiver provision in Modification No. 49. On March 13, 1958, plaintiff duly appealed this decision to the Japan Board, which in March 1962 denied the claim on the ground that no duty of reimbursement by the Government for delays caused by Shimato had ever arisen and, if it had, it was barred by the waiver clause. That decision was appealed to the ASBCA, which in February 1963, after arguments based on the record before the Japan Board, denied the appeal, limiting its decision to the ground that no duty to prevent interference by Shimato had arisen. A motion for reconsideration was denied by the ASBCA in July 1963.

■ The contractor first argues that the defendant *warranted* that Shimato would complete its work in time, meaning that the United States would be liable for such failure even though the Government was in no way negligent, unresponsive to its obligations, or otherwise at fault. "In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any

2. Now claimed at $155,670.72.

duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 699 (1964). Plaintiff's position that it received an absolute assurance is rested on conversations it had with the defendant prior to the award; on Article 12 of the plaintiff's contract, supra; and on the general principle forbidding hindrance to a contractor. The ASBCA found that there was no such warranty, and we are asked to overturn that holding.[3]

Prior to entering into its contract, Paccon sought oral assurances from the Government that it would coordinate the work of plaintiff and of the grading-and-utilities contractor so as to prevent interference and delay to plaintiff. As the ASBCA put plaintiff's testimony:

* * * [Plaintiff] was represented at the contract negotiations by its vice president, Mr. John A. Willard. Mr. Willard's testimony about the contract negotiations to the following effect has not been controverted by the Government: During negotiations Mr. Willard inquired about who was going to do the site grading and utilities work and under what conditions it would be performed by others so as not to delay or interfere with [plaintiff] in the performance of its own job. The Government representatives stated that a contract for the site grading and utilities work had been put out for bids at about the time as the contract being awarded to [plaintiff], that negotiations of such contract were near com-

pletion, and that an island-wide contract for utilities work would be awarded to Shimato Construction Company in a few days. This was not enough to satisfy Mr. Willard, and the Government representatives stated further that they knew from past experience that Shimato was a very reputable firm with an excellent performance record. This still did not satisfy Mr. Willard; whereupon, the Government representatives "assured" him and told him "categorically" that [plaintiff] "had nothing to worry about" and made the following statement:

" "* * * The Government itself will set the priorities, not only in terms of lots or areas but as to portions of lots as such and in terms of your performance, their performance will be scaled to yours, scheduled to yours, so that the turnover of houses will be accomplished at the same time as the turnover of applicable related utilities'." Relying on such assurances, [plaintiff] was satisfied and signed the contract.

 The Board credited the substance of this testimony, though perhaps not accepting every precise word,[4] and so of course must we. Like the Board, we conclude that this pre-award discussion does not show any warranty or undertaking by the defendant that it would be responsible for Shimato's failures, regardless of governmental fault. The testimony does not affirmatively prove any such absolute guarantee, which would be a most unusual undertaking for the Gov-

---

3. Both parties agree that plaintiff's warranty claim, if upheld, is redressable under the "suspension of work" clause, which is the basis of the jurisdiction of the boards below. This clause (GC–12) provides an equitable adjustment "[i]n the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor", but the delays which it contemplates are those by action of the Government or for which the Government is responsible. See also note 10 infra.

4. The Board said:
 "We accept Mr. Willard's testimony about what happened during contract negotiations as being substantially correct, particularly since it has not been controverted in any way by any evidence adduced by the Government although some haziness in his memory is to be expected when he testified in December 1959, five and a half years after the event, and we would expect his choice of language to be influenced to some extent by his desire to spell out the legal elements of reliance on promises and representations."

ernment to shoulder. On the contrary, Mr. Willard's evidence is more easily susceptible of another interpretation, as we point out below. A warranty *guaranteeing* a contractor against delays by other contractors is so apart from the general rule announced in United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946) (and other cases), that it should not be inferred from ambiguous, inconclusive, or general discussions. In this instance, that the oral representations made by the Government negotiators to Paccon did not amount to such an express covenant is bolstered by the fact that the comprehensive notes made by the Government representatives recording negotiation proceedings do not refer to such a warranty, and during the early stages of contract performance when the plaintiff was suffering delays from Shimato's failure to perform there was no reference by Paccon to a warranty in the complaints it filed with the Government.[5]

■ For similar reasons, this type of absolute guarantee cannot be drawn from Article 12, supra, dealing with "Other contracts", or from the accepted principle that the Government should not interfere with its contractor's work. It is almost impossible to stretch the contract article —phrased primarily in terms of the contractor's obligations, not the defendant's—to cover an unusual assumption by the Government of responsibility without fault for the actions, not of its own servants, but of an independent contractor. As for the general rule that neither contracting party can obstruct the other's performance, the court said in L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 563, 177 Ct.Cl. 870, 878, (1966), a comparable case involving a second contractor, that "it is clear * * that defendant is not liable for delays which it did not cause, over which it had no control, or delays encountered by a contractor notwithstanding defendant's diligence in performance of its responsibilities under the contract." An absolute guarantee of third-party performance was thus found not to be subsumed in the general duty to forbear from interference with the contractor.

There are, however, obligations less than that of an absolute guarantee. The court has recently held that the United States can incur liability toward the disfavored contractor in a "two contractor situation" where the Government is at fault in some way. Hoffman v. United States, 340 F.2d 645, 166 Ct.Cl. 39 (1964); L. L. Hall Constr. Co. v. United States, supra, 379 F.2d 559, 177 Ct.Cl. 870; John A. Johnson & Sons, Inc. v. United States, 180 Ct.Cl. 969 (1967). The real issue, then, is whether the defendant had such a narrower responsibility in this case.

■ The immediately relevant facts have been found by the ASBCA. It concluded that, in the course of the pre-contract discussions, the Government's representatives promised plaintiff to impose a schedule of priorities of work on Shimato coordinated with Paccon's work. That conclusion is well supported, if not compelled, by the credited evidence, and of course we accept it. We must accept, too, the Board's factual finding that "so far as can be determined from the record" the Government did impose such a schedule on Shimato.[6]

---

5. The fact that the defendant promised that it would impose a schedule of priorities on Shimato does not necessarily constitute an absolute warranty that the schedule as imposed would be lived up to. This may have been what the plaintiff was seeking, but there is no good evidence that it was in fact given. It was well within the plaintiff's power to demand such a guarantee in terms, though it might be refused.

6. In its motion for reconsideration before the Board, plaintiff complained of this finding and referred to extra-record material said to show the contrary. The Board properly refused to consider these extra-record statements, and pointed out, as it had in its original opinion, that at no time during performance of the contract did plaintiff complain that the defendant had failed to carry out its promise to put a schedule of priorities on Shimato. "On the contrary, the record

The point at which we are forced to depart from the Board is its assumption that the defendant's agreement to set up priorities did not imply a promise to do what the Government reasonably could to enforce the schedule. That basic premise is threaded throughout the Board's decision; the position seems to be that, after the Government established the priorities, it could sit back without lifting a finger or saying a word, no matter how far or how improperly Shimato deviated from that schedule—the Government would have no obligation at all after the priorities were set.

█ It is well to note at once that, although the Board may have considered this conclusion a true finding of fact (as to the parties' "intent"), it is not really that but rather a legal conclusion as to the scope of a contractual agreement. As such it is not binding on us, but the question may be determined for ourselves under Section 2 of the Wunderlich Act. On the basis of the factual testimony credited by the Board, we are free to decide the legal obligations incurred by one party and accruing to the other. Cf. Lockheed Aircraft Corp. v. United States,

375 F.2d 786, 790, 179 Ct.Cl. 545, 552–553 (1967).[7]

When we consider that question *de novo* we have to take account both of the pre-contract negotiations and of Article 12 of the plaintiff's contract, supra. The Board seemed to think that the discussions meant no more than that plaintiff was willing to take all the risk that Shimato would comply with the Government's schedule of priorities, and did not expect the defendant to do anything more than set the schedule up.[8] To us, this is an unreasonably restrictive interpretation, without warrant in the evidence, common understanding, or the law. The normal bidder, told that the Government will set the priorities for another contractor in terms of the bidder's own performance, and scaled to his work ("so that the turnover of houses will be accomplished at the same time as the turnover of applicable related utilities"), would naturally think that the Government would follow through on the priority schedule, so far as it reasonably could. The normal bidder, anxious for reassurance, would hardly be satisfied with a paper schedule, not to be enforced or policed in any way by the defendant. He would certainly assume that that is

is replete with complaints made by [plaintiff] during performance that the schedule of priorities imposed on Shimato were not being followed by Shimato." This was substantial affirmative evidence supporting the finding, and suffices to sustain it. We do not understand the Board's opinions (either the original opinion or that on reconsideration) as resting on the failure of plaintiff to prove the contrary as the basis for making the finding. The Board had substantial evidence, not a void, on which to stand.

7. If, contrary to our view, the administrative conclusion were deemed a factual finding, we would hold, for the reasons stated below in the text, that it was unreasonable and unsupported by any substantial evidence in the record as a whole.

8. The Board summarized in this way its view of the effect of the negotiations: " * * * During the contract negotiations the contractor was apprehensive about entering into a contract where its costs and ability to perform were depend-

ent so much on performance by another contractor and hesitated to take such a business risk unless it could satisfy itself that conditions would be such that it could afford to take such a risk. The Government gave the contractor information about the contractor it intended to award the utilities contract to and its plans to coordinate the work under the two contracts so as to avoid delays and disruptions of work. The contractor was then satisfied to the extent that it decided that it was willing to take the business risk that Shimato would be a satisfactory contractor and that the Government's plans for coordinating the work and preventing delays and interference would be effective. What appellant relied on was, not any supposed contractual warranty, but its own judgment that Shimato had the ability to perform satisfactorily and that the Government's plans were workable and would be effective in accomplishing their intended purpose."

not all the Government promised, and he would be entitled to make that assumption. In common understanding the words spoken by the defendant's representative would necessarily imply a carrying-through, unless they were expressly qualified to negative any further action by the Government after the priority schedule was initially announced.

This would be all the more so in this instance in which Paccon knew that its contract would contain Article 12, supra, expressly granting the contracting officer the right to direct plaintiff to "carefully fit" its work with that of the second contractor—and plaintiff undoubtedly expected that Shimato's contract would have a similar provision (as it in fact did).[9] The Government would thus have the power to exercise control over Shimato in the aspects important to plaintiff's performance. In the face of the defendant's outright statement as to what it could do, why should plaintiff think that the defendant would not, and would not have to, invoke and use these powers in reasonable fashion?

█ In these circumstances we think it clear that the Government did have the obligation to do what it reasonably could to see that Shimato complied with the schedule of priorities. In a comparable two-contractor case, in which the second contract contained a provision like Article

12, the court held that the Government could not disavow its responsibility under the article (once its attention was called to the problem) to direct or require the necessary cooperation from the contractor whose activities were hurting the plaintiff. Hoffman v. United States, supra, 340 F.2d at 649–651, 166 Ct.Cl. at 47–49. In another recent decision we said, "It is plain that the Government is obligated to prevent interference with orderly and reasonable progress of a contractor's work by other contractors over whom the Government has control." L. L. Hall Constr. Co. v. United States, supra, 379 F.2d at 564, 177 Ct.Cl. at 879. See also, to like effect, John A. Johnson & Sons, Inc. v. United States, supra, 180 Ct.Cl. at 989–991.[10] We need not decide that defendant would be liable for failing to set and reasonably enforce priorities if the plaintiff had not asked it to do so. Unlike the *Hoffman* situation, we are not even required to hold that defendant would be liable if Paccon had raised the problem during performance, rather than prior to the award. Here, the issue arose before the contract was made and the Government's representative gave a promise which in our view can only be construed as obligating the Government to use reasonable efforts, under its powers of control, to make Shimato comply with a proper priority schedule.[11]

---

9. Obviously some such clause would have to be included in Shimato's contract to authorize a governmental schedule of priorities. In fact, Shimato's contract also contained SC–3F ("Priority of Work"), supra, which specifically related to coordination of Shimato's work with the housing to be built by plaintiff, and expressly gave the defendant power to set priorities.

10. Defendant urges that to allow any recovery for a failure of the Government to fulfill this obligation would contradict Article 5(c) of the contract ("Termination for Default—Damages for Delay—Time Extensions") which includes "acts of another contractor" among the grounds for granting a time extension. But that article does not provide that the *only* relief for harm caused by another contractor is a time-extension; if it were not

for the Suspension of Work Article, the contractor could clearly, under our decisions, sue directly in this court (without pursuing an administrative remedy) for unreasonable delay-damages caused by the defendant's breach of its obligation. In this case neither party questions the applicability of the Suspension of Work Article if the defendant was at fault. See also note 3 supra.

11. The parol evidence rule does not forbid consideration of the pre-award discussions. As we have pointed out (see note 10), Mr. Willard's testimony does not contradict or counter anything in the written contract. On the contrary, the Government's pre-award promise served merely to spell out and trigger, in one specific respect, the latent obligation, implicit in the written contract, of the Government to take reasonable steps to

The next point is whether the Government actually met this obligation. The ASBCA did not determine whether the defendant did what it reasonably could to enforce the priorities set for Shimato,[12] and the record is such that we cannot say that only one conclusion could be drawn on that issue. The case will therefore have to be returned to the Board for further proceedings. Since this is a very old controversy, plaintiff asked us at oral argument to have the issue tried and decided directly in this court, but as we understand the Supreme Court's recent decisions (United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed. 2d 642 (1966); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966)), we do not have that power in this case, regardless of its vintage, but are compelled to await a determination by the administrative agency. If the United States was at fault, the Suspension of Work Article is agreed to be applicable; both parties concur in that. See notes 3 and 10 supra; John A. Johnson & Sons v. United States, supra, 180 Ct.Cl. at 990–991. The dispute therefore arose "under the contract" and the relevant facts must first be determined administratively.

The trial commissioner agreed that the defendant would only be liable if it were at fault, but he saw no need for additional administrative consideration on the issue of liability because he thought the Government's fault conclusively shown by its failure to terminate Shimato's contract at Futema and to award the utilities-and-grading work to plaintiff—as had been done at Sada. There are two main reasons why we cannot follow that lead. One is that, so far as the administrative briefs reveal, Paccon did not argue to the Japan Board or the ASBCA that the Government was required to take the course of terminating Shimato and substituting Paccon. Since the point was not before the Boards, certainly not before the ASBCA, the administrative record and findings were not directed and molded to that issue; rather, the contractor's insistent argument was that the Government could have controlled Shimato's performance but failed to do so. Moreover, the plaintiff did not make or adopt the point in this court until after the trial commissioner's opinion. We think therefore that the issue has not been properly raised in the case, and it is too late to raise it now. A substantive ground for departing from the commissioner's position is that the gist of the Government's obligation, as we see it, was to police Shimato—to enforce coordination—not to make sure that in any event the plaintiff's work was left unimpeded. If the defendant fulfilled its undertaking reasonably to enforce the priority schedule,

coordinate the work. See Hoffman v. United States, supra. In this light the oral negotiations were admissible as an aid to interpretation of the contract (3 Corbin on Contracts § 579 (1960 ed.)), as well as because the collateral oral promise would be the type the defendant would naturally make, in these circumstances, without including it in the formal written agreement. See Restatement of Contracts § 240(1) (b) (1932); 3 Corbin, supra, § 584; 4 Williston on Contracts § 638, at 1040–43 (3d ed. 1961). Moreover, it is unnecessary to call the defendant's pre-award statement a "promise"; it would have the same effect as a "representation" on which Paccon relied. See John A. Johnson & Sons, Inc., v. United States, supra, 180 Ct.Cl. at 989.

12. At one point the Board says that "the record does not indicate that Shimato's unsatisfactory performance was due to any fault of the Government or any failure of the Government to take proper action in the administration of the Shimato contract", but we can only read this statement—in the light of the remainder of the opinion, especially the discussion under the heading of "Decision"—as referring solely to the Government's obligation to establish a schedule of priorities. That is the only obligation the Board thought rested on the Government and it was only with respect to that specific responsibility that the Government could be at fault (in the Board's view).

but nevertheless Shimato lagged behind, the defendant had no obligation to plaintiff to exercise its broad discretionary authority to terminate Shimato for convenience or for default (Schlesinger v. United States, 182 Ct.Cl. ——, 390 F.2d 702, 706–707 (1968)) in order that Paccon might do the work itself and proceed unhindered. In other words, Paccon assumed the business risk that the defendant's attempt to coordinate might fail despite all its reasonable efforts.[13]

The matter must therefore go back to the ASBCA to decide whether the Government attempted to enforce the priority schedule on Shimato as much as it could reasonably be expected to do. We make three suggestions as guidelines to the Board. The first is that in the further administrative proceedings the plaintiff has the ultimate burden of proof, but the defendant is charged with producing evidence peculiarly within its possession; and failure to do so would normally lead to adverse inferences. See, e. g., Alpirn v. United States, 124 Ct.Cl. 670, 675, 111 F.Supp. 280, 283 (1953). That principle has been specifically applied to a "two-contractor" case in which the Government did not justify its actions and omission. L. L. Hall Constr. Co. v. United States, supra, 177 Ct.Cl. at 879, 379 F.2d at 563–564. Here, the contractor cannot be expected to produce much evidence as to what the Government did or did not tell Shimato or order it to do, after the priority schedule was established. The defendant is in much better position to make that showing.

Secondly, the administrative authorities might well consider taking evidence on, and determining, the issue of quantum (the amount of recovery, if defendant is liable) in the same proceeding (if the parties do not stipulate)—in order to expedite this already aged dispute. This could be done even though

the ASBCA decides that the Government did all that it reasonably could to enforce the priority schedule on Shimato, so that if this court should hold otherwise another trip to the Board would be eliminated. But since we cannot foresee all the possibilities we leave this matter entirely to the Board's sound discretion.

Thirdly, in the new proceeding the ASBCA should definitely deal with the separate defense of waiver to the extent it is still in the case.[14] In Modifications 45, 46, and 49, the plaintiff signed an agreement which provided (among other things):

> The Contractor hereby waives any known or reasonably apparent claim against the Government for damages or extension of time by reason of delay heretofore occasioned by the Government in the performance of this Contract.

The trial commissioner held that the waivers in Modification Nos. 45 and 46 were without consideration. No. 45 was to provide an equitable adjustment for the installation of curtain brackets, and No. 46 was to provide a similar adjustment for additional waterproofing of roof slabs and application of sand cushions around the buildings. The commissioner said: "Since the price adjustments contained in these modifications covered only the cost of the actual changes, as demonstrated by the computations accompanying them, there was no consideration to support the waiver clauses inserted gratuitously. A valid release must be supported by consideration. A.R.S. Inc. & National Truck Rental Co., Inc. v. United States, 157 Ct.Cl. 71 (1962)." Defendant now concedes that the commissioner was right, and we agree. The purported waivers in Modification Nos. 45 and 46 are therefore no longer in the case.

13. In addition, the existing record is too unclear and too skimpy on this point for us to say that the Government, to act reasonably in the circumstances, *had* to terminate Shimato and award the work to Paccon. If the issue were pertinent

to the case, we would have to suspend to permit the ASBCA to consider it.

14. The ASBCA did not reach that issue in its earlier consideration.

█ The situation is different as to Modification No. 49, which the plaintiff signed knowing that it contained a waiver of delay claims. This modification provided no price adjustment at all, but simply granted an extension of time. As to this the plaintiff states that not only was there an absence of consideration for the waiver, but also that it was executed under economic duress, over plaintiff's protest, and upon the representation that the Government would withhold approximately $100,000 if it were not signed. Such a withholding, plaintiff says, would have threatened it with bankruptcy. In two of plaintiff's other claims arising under another contract between the same parties, and as to which the evidence was heard at the same hearing during which the Japan Board entertained the present claim, the ASBCA found that the waiver clauses in three modifications to the other contract were invalid because of duress. Appeal of Paccon, Inc., 1963 BCA ¶ 3659. But there has been no such administrative finding here, and on the present record we cannot say that the same conclusion of duress must necessarily be reached with respect to this different contract. The administrative body will have to find the facts and make the determination in the first instance.

## II

The defendant has not sought review of Commissioner Bernhardt's disposition of Count 4 of plaintiff's petition.[15] Since the court agrees with his opinion and recommendation on that count, it adopts it, with a slight modification, as its own.

The commissioner's opinion on Count 4, with the slight modification by the court, is as follows:

█ On January 22, 1955, the plaintiff was awarded a contract for the construction of 127 houses and appurtenant utilities at a different location at Sukiran, Okinawa, than the contract involved in Count 1, supra. Several claims arose,

including the instant one relating to the laying of a sewer line. The original contract drawings prescribed the location of the sewer line connecting certain manholes in a swamp in the "plaza area." The logical method of proceeding, and that which plaintiff anticipated using, was to lay the sewer line first and then place fill over it. Defendant denies essential parts of plaintiff's allegations that the Government changed the location of the sewer line, and that plaintiff then placed the fill in the swamp area at the original site of the sewer line, which fill it had to subsequently excavate when the Government again changed the sewer line location back to the original site, thus resulting in the present claim for an equitable adjustment for changes. After an adverse ruling by the contracting officer and an appeal and hearing before the United States Army Japan Board of Contract Appeals, the latter denied the appeal by decision dated June 16, 1961 USARJ BCA No. 70). Because the amount involved was less than $50,000, there was no appeal to the ASBCA. The issue is solely as to controverted facts under the contract and our review is therefore governed by Wunderlich Act criteria. 41 U.S.C. §§ 321–322 (1964). The decision of the Board was grossly erroneous.

█ The dispute turns principally on whether the Government's Resident Engineer, a Major Flynn, had issued effective instructions to the plaintiff to change the location of the sewer line from that depicted in the original contract drawings. The plaintiff's proof of such instructions consisted primarily of an ozalid print of a tracing of a small area which purported to show a revised location for the sewer line. The ozalid print, which was Appellant's Exhibit 21, was dated October 26, 1955, and bore what plaintiff's witnesses identified as the signature of Major Flynn. The Board sustained the Government's objections to the admission of this exhibit

---

15. The defendant's request for review states: "Defendant requests review of the Commissioner's opinion on Count 1 only and does not seek review of his opinion on Count 4."

into evidence on the grounds that the plan had not been shown to be official in that the signature of Major Flynn had not been properly authenticated. Plaintiff's witness testified under oath that he was familiar with the signature of Major Flynn on at least 100 other contract documents and could recognize it, to which the Board remarked at trial that the witness was not competent to swear to the authenticity of the signature because it would take no less than a handwriting expert. This ruling was improper. E. g. Rogers v. Ritter, 79 U.S. 317, 20 L.Ed. 417 (1870). The plaintiff's witnesses could not recall the precise circumstance of the receipt of the disputed plan, but explained that in the regular course of business under the contract the plaintiff's representative picked up contract communications almost daily from the office of the Government's Resident Engineer, that it was impossible to remember each such communication, that at least 100 changes in contract drawings had been received and acted on in this fashion, that it was accepted practice for the plaintiff to proceed with such ordered changes presented in preliminary drawings in advance of their being incorporated into formal revised drawings prepared later for approval of the contracting officer, that the contract would not have been completed in time if plaintiff had refused to proceed until formal drawings were furnished, and that plaintiff had been occasionally criticised for balking at proceeding with changes informally ordered. The particular document had been found by plaintiff in its files and, as stated, plaintiff's witnesses could not recall the precise circumstance of its being received, although they recalled that, in response to what they regarded as a valid instruction of Major Flynn, they had proceeded to place fill in the swampy area originally designated for the sewer line, and had staked out the new location for the sewer line prescribed in the disputed drawing. In corroboration of the procedures described for the transmission of instructions via informal drawings showing changes in sketch form, the plaintiff's witnesses further testified that at the outset of contract performance they worked from preliminary drawings rather than formal contract drawings. The Government offered no testimony to refute or rebut the testimony of plaintiff's witnesses, and did not produce Major Flynn, whose testimony could have been decisive.

Upon receiving the disputed plan from the office of Major Flynn the plaintiff, in reliance on it, placed fill to a considerable depth in the swampy area originally designated for the sewer line, and in December 1955 staked out the sewer line excavation in the new location. It may be reasonably assumed that these several operations by the contractor were highly visible to Government inspectors. In approximately January 1956 the plaintiff was instructed verbally by an A. B. Jones, then civilian assistant to Resident Engineer Major Flynn, to relocate the sewer line back to the original location in the swampy area which had by then been filled in. This verbal instruction was followed by an ozalid print of a tracing from the original contract drawing of that portion of the site, which print showed the location of the sewer line reverted to the original site. The print bore the initials of A. B. Jones, according to the identification of plaintiff's witnesses, but the initials were illegibly reproduced. The Japan Board refused to accept this print (Appellant's Exhibit 24) in evidence except for the limited purposes of establishing that it came from plaintiff's files and showed where the sewer line was ultimately laid. As in the case of Appellant's Exhibit 21 (the drawing purportedly signed by Major Flynn, supra), the plaintiff's witnesses had no recollection of actually receiving it from Mr. Jones, but testified that it was undoubtedly received in the regular course of business in the manner described with respect to Appellant's Exhibit 21. The reluctance of the Japan Board to credit the exhibit itself with full evidentiary status is difficult to understand, since there is no dispute that the

sewer line was installed at the location shown in Appellant's Exhibit 21, this being the identical site prescribed by the original contract drawing. Mr. Jones was not called as a witness to refute the testimony that he had issued the drawing. Later evidence proved that he had.

In finally installing the sewer line the plaintiff was required to excavate a trench about 20 feet deep and quite wide through the fill which it had previously placed on the site, then lay the pipe and re-cover it with fill. It was paid not only for the original fill, but also for the excavation and backfilling. Later the contracting officer recovered the sums paid plaintiff for the excavation by deductions from progress payments, on the ground that the extra work done by plaintiff was not authorized. Upon complaint by plaintiff the contracting officer agreed to reconsider the deduction. A conference was held on October 22, 1956, to discuss this and other problems. The plaintiff on that date wrote a letter to the contracting officer verifying discussions at the conference, which was attended by representatives of both sides, including the Government's Resident Engineer E. Kernberger (who had succeeded Major Flynn), and Messrs. Jones and Raymundo, who were Kernberger's assistants. The letter recites the following statements made by Mr. Jones:

a/ On December 6, 1955, Contractor staked out sewer line according to Drawing from Officer of Major Flynn dated October 26, 1955, indicating a change over original Contract Drwg. Surveyors of District Engineer Office checked said stakes.

b/ On March 5, 1956, Contractor restaked for same sewer system as per drwg of original contract drwg.

c/ Surveyors of District Engineer Office removed some of these new stakes and called Contractor to the attention that these do not coincide with sewer line as per drwg from Office of Major Flynn, dated October 26, 1955.

d/ Mr. Jones & Raymundo indicated that the decision to install said sewer line according to original contract drwg, instead of drwg from office of Major Flynn, Drwg No. for the former being 71-07-29, Sheets Nos. 2 of 6 and 4 of 6, dated October 11, 1955, was made by Contractor personnel, Mr. Bob Liston. In view of this, *Mr. Jones & Mr. Raymundo contended that sewer line should have been laid as per drwg from Office of Major Flynn instead of original contract drwg and that Contractor for this reason cannot be entitled for payment for dragline excavation.* (Emphasis supplied.)

The letter in question was confirmed as to accuracy by the signatures of Messrs. Jones and Raymundo for the office of the Resident Engineer. There is no evidence whatsoever that the recital is not a correct account of events. The events so recited fully corroborate the factual contentions upon which plaintiff's claim is based, discountenance the Government's denial of those facts, and demonstrate the error of the Japan Board in refusing to admit Appellant's Exhibits 21 and 24 in evidence as authentic preliminary Government drawings instructing the plaintiff to make changes, causing as a natural consequence the costs for which plaintiff seeks recovery. The extent of the Government's vacillation is illustrated by paragraph d of the letter quoted above, wherein Messrs. Jones and Raymundo not only admit the validity of Appellant's Exhibit 21 (the disputed drawing signed by Major Flynn), but also contend that plaintiff erred in not installing the sewer line at that location instead of the original location, even though the installation at the original location was performed pursuant to an interim revised drawing of Mr. Jones himself (Appellant's Exhibit 24). Ultimately the contracting officer disagreed with Messrs. Jones and Raymundo, for the original location was designated as proper for the installation. The contractor could scarcely be accused of failing to follow instructions when the Government representatives themselves were so divided as to which of several conflicting instructions the

contractor was to follow. Strangely enough, the Japan Board decision and the Government's submitted brief make no reference to this vital and conclusive admission in the record.

The factor of greatest persuasion which led to the erroneous decision of the Japan Board was that the *official* revisions of the original contract drawings failed to reflect any changes in the location of the sewer line, and made no reference to the interim preliminary drawings which bore the disputed signatures of Major Flynn and Mr. Jones and changed the sewer line location. The ideal is often not encountered in large, hurried construction projects, where demands for immediate action on design changes cannot wait the issuance of formally documented instructions. This is often seen in connection with constructive changes. Where the Government initiates or tolerates a degree of informality in its orders to contractors directing deviations from official specifications, it cannot later repudiate these instructions solely for a lack of protocol, although it remains the contractor's burden to prove that the changes were authorized. Were it to be otherwise, it would be too easy for the Government to avoid responsibility for informally authorized changes merely by a deliberate omission in official drawings. The Board's observation that Major Flynn's drawing was at best only a "suggested revision" upon which the contractor could only rely at his peril was unfair under the circumstances.

The plaintiff's extra costs of excavating the fill material and then back-filling resulted from actions taken by it in reasonable reliance on instructions of the Government. The Board's findings to the contrary are grossly erroneous. The plaintiff is entitled to judgment on Count 4 in an amount to be determined by the Japan Board on remand.

### III

Our conclusion on Count 1 is that, with respect to that claim, further action in this court must be suspended on the cross-motions for summary judgment for six months from this date to allow the parties to return to the Armed Services Board of Contract Appeals for the determinations indicated in Part I supra. On Count 4, the plaintiff's motion is granted and the defendant's is denied. The plaintiff is entitled to recover on Count 4 and judgment is entered to that effect. Further proceedings here will be suspended for six months to allow the United States Army Japan Board of Contract Appeals to determine the amount of recovery. Upon the conclusion of the respective Board proceedings, the plaintiff will report the results to the court and the parties will take further appropriate action looking toward the ultimate disposition of these counts in this court.