EVERETT PLYWOOD AND DOOR
CORPORATION

v.

The UNITED STATES.

No. 40–64.

United States Court of Claims.
Dec. 12, 1969.

Emmett G. Lenihan, Seattle, Wash., attorney of record, for plaintiff, James F. McAteer and William F. Lenihan, Seattle, Wash., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on March 20, 1969. Defendant excepted to the commissioner's findings, opinion and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, with a minor

deletion by the court, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $438,263.74.

Commissioner Hogenson's opinion, with a minor deletion by the court, is as follows:

This is a contract action based on an agreement of July 15, 1955, between plaintiff and defendant (by its Forest Service Department of Agriculture), in which plaintiff agreed to cut and purchase timber located on the Tonga Ridge of the Snoqualmie National Forest in the State of Washington. Plaintiff's claim is founded upon losses sustained because the volume of timber actually cut was substantially less than the quantity advertised by defendant in its prospectus for bidding and thereafter stated in the contract. While plaintiff seeks reformation of the contract, the determinative issue is whether the Forest Service in its prospectus and in the contract extended to plaintiff a warranty of quantity.

Plaintiff contends that it was entitled to rely on defendant's representation that the volume would be 73,100 M board feet of merchantable timber and that it is entitled to recover damages for loss of stumpage and for its failure to recoup road development costs, resulting from the undercutting of the timber. Defendant contends that this was a sale of a specific lot of timber, in which there was no warranty of volume, and also that the difference between the estimated or contract volume and that cut was due to plaintiff's cutting and logging procedures, a reduction in the total area of the cutting units pursuant to plaintiff's request, and disparity of methods used to measure the standing timber and the log volumes of the timber cut.

Plaintiff corporation of Everett, Washington, is engaged in manufacturing plywood from timber purchased as raw material. In 1952, Forest Service personnel conducted a reconnaissance of the Tonga Ridge to lay out generally the course of a road system to be used for hauling of logs in a proposed sale, but which was to become a permanent road system (except for spurs) for future forest operations, including use by the public for recreational purposes. There were only forest trails through this area. In 1953, the Forest Service had the right-of-way location of the main road marked on the ground by a surveying crew, and also had some of its personnel conduct a cruise of timber areas to be included in the sale, to estimate the volume of merchantable timber to be cut. The cruising lasted for 16 weeks through the summer and into the early fall of 1953. Of the 15 tracts or units later included in the contract, defendant's estimate was that 14 cruised units would yield 60,280 M board feet, and that uncruised unit 15 had 12,820 M board feet, based on data and information obtained in the cruise of unit 6, comparable in size to unit 15, for a total of 73,100 M board feet.

Pursuant to the contract, plaintiff undertook to clear, cut and purchase all dead and live merchantable timber

* * * from an area of about 1,240 acres to be definitely designated on the ground by a Forest officer prior to cutting, in Sec. 35., T. 26 N., R. 12 E. and Sec. 1, 2, 3, 4, 8, 9, 10, 11, 15, T. 25 N., R. 12 E., W.M. within the Snoqualmie National Forest, as * * * designated on the attached map which is part of this agreement, * * *

which contract map showed as the cutting areas, in addition to the 30-acre road right-of-way, 15 noncontiguous and irregularly shaped tracts, not described by metes and bounds or otherwise by boundary surveys within the land sections mentioned, all located within the forest extending over the Tonga Ridge.

Plaintiff also undertook to construct necessary roads as specified and at its own expense, such costs to be recouped as herein described.

The contract recited that the "estimated" amount of such merchantable timber to be cut from such tracts was:

4,100 M board feet of Douglas-fir

2.200 M board feet of Western redcedar and Alaska yellow-cedar

600 M board feet of Western white pine

66,200 M. board feet of Western hemlock, Pacific silver fir and other species

A total of 73,100 M board feet, more or less, of live and dead saw timber.

These same quantities and types of timber on the subject tracts were included in defendant's prospectus, issued by defendant on May 23, 1955, and received by plaintiff on May 26, 1955, with the total volume stated to be "73,100 M board feet, more or less." Such quantities and types were also set forth (with "more or less" stated as to each quantity) in defendant's preliminary advertisement of sale, published on November 2, 1954, in the Daily Journal of Commerce, and its three advertisements of sale published in the same newspaper on May 16 and June 14 and 30, 1955. Plaintiff was not a subscriber of that newspaper, and none of the advertisements was called to its attention.

The subject sale was on oral auction bidding, held on July 15, 1955, after the various bidders had submitted sealed bids. A minimum bid stumpage rate was required for each type of timber per M board feet, called the advertised rate. Competitive bidding was on about 60 percent of each type of timber, a certain volume prescribed by the prospectus, and plaintiff's successful bid rates became the contract rates on those quantities. On the balance of each type of timber, each bidder was required to bid the same, i. e., at the advertised rate. Of course, the bidding proceeded on the precise overall volume of each type of timber, stated in the prospectus and in the above-quoted language of the contract. For example, the competitive bidding on Douglas-fir was on 3,000 M board feet, with the uniform bidding at the advertised rate on the 1,100 M board feet balance of the contract volume of that type.

The contract contained a provision that as of July 1, 1959, the Forest Service would redetermine the rate to be paid for each type of timber cut in excess of the competitive bid volume. Rate redetermination is a method devised by the Forest Service to afford relief to purchasers in cases in which the cutting of the timber will extend over several years.

In successive reappraisals in each of the years 1959 through 1967, the Forest Service consistently established the same redetermined rate for each type of subject timber. None of the redetermined rates on the various timber types is in dispute in this case.

As in the subject case, the successful bid rates (contract rates on competitive bid volumes) generally exceed the redetermined rates (effective only on quantities in excess of competitive bid volumes), because bidders tend to bid substantially in excess of the Forest Service's original appraisal (advertised rates) in the competitive bidding, in the expectation that the redetermined rates will be substantially lower than the contract rates, thus providing overall average rates lower than the successful bid or contract rates. This was recognized by the Forest Service.

The Forest Service used the same appraisal method to establish a redetermined rate as was employed to determine the advertised rate, i. e., the market value of lumber and other products was established, from which was subtracted the overall cost of getting the standing timber through the manufacturing process. Such costs included required road development and others incident to logging operations, transportation of the logs, and manufacturing. The road costs were included, both in the original appraisal and in the reappraisals for redetermined rates in subject case, by dividing the estimated road construction cost by the estimated total volume of timber to be cut. The difference between the market value of the products and the overall costs is

termed the conversion return. This return is divided between the purchaser and the Forest Service, first an allowance of profit to the purchaser, with the rest being the stumpage price (plus slash disposal and reforestation fees) to be paid to the Forest Service.

With respect to road development costs, the purpose of defendant's appraisal method was to allow plaintiff (and any other purchaser in the general application of this method) to recoup or recover its road costs by effectively reducing the price that it was to pay for each M board feet of timber cut. If the full estimated quantity of timber were cut, plaintiff would recoup its entire road costs in the nature of proportionate reductions in the price of each M board feet of timber.

In effect, the appraisal method employed by the Forest Service resulted in construction of roads by a purchaser of timber, with the Forest Service paying for such roads not with appropriated funds, but with timber. In fact, the Forest Service had no appropriated funds for the road construction involved in this case, and the use of the appraisal method was necessary.

After the Forest Service regional office had completed its plans and preparations for the proposed Tonga Ridge sale, and before the issuance of the prospectus, it was necessary to submit the proposed sale to the Chief of the Forest Service, Washington, D.C., for the consideration and approval of his office, since this was a sale involving more than 50,000 M board feet of timber. In addition to approving the sale, the office of the Chief suggested (but left such matters to the discretion of the regional office) that a recently approved contract form be used on the subject sale, and that in arriving at the allowance for amortization of road costs, the accelerated road amortization method be used, rather than regular road amortization. The new contract form, not employed in this case, contained the following significant provision:

Section 2b. Estimated Volumes and Rates.

1. The provisions of Sections 2a, 3a and 3b, as applied by the Forest Service, shall govern the actual quanity of merchantable timber to be cut regardless of whether it is more or less than the estimated quantities set forth below and such estimates are not to be construed as guarantees or limitations of the quantities to be designated for cutting under the terms of this contract.

No comparable provision was contained in subject contract, which had no provision relating to guarantee or lack of guarantee of estimated volumes of timber.

The Acting Regional Forester elected not to use the new contract form, because his office was then using the standard form employed in this case on all other pending sales, and he concluded that his office was not administratively prepared to adapt an individual sale to the new form. However, it is significant that the Forest Service personnel were confident that their cruise estimates were reasonably accurate, having reviewed the cruise data just two days before the auction bidding. Also, the use of accelerated road amortization could be deferred, since such provisions were applicable to quantities of timber only in excess of competitive bid volumes.

By contract amendment executed by the parties on July 17, 1959, provisions for accelerated amortization of road costs were added. In order to protect purchasers from the loss of recovery of development costs when volume estimates exceed actual cutting, the Forest Service had developed an accelerated road amortization clause, which in effect allows the purchaser to recoup its road costs against the first 80 percent cut of the contract volume. In this way, if the sale were to undercut 20 percent or less, the purchaser would be protected in that his road development costs would already have been recovered.

Accelerated road amortization rates were provided in subject case. However, they were applicable only to the quantities of timber in excess of competitive bid volumes. Consequently, only the accelerated rate pertaining to Western hemlock and related species became applicable, and then only with respect to a minor quantity.

The total volume of timber, cut or to be cut on the subject sale, amounted to 46,-081 M board feet, or 27,019 M board feet less than the contract volume of 73,100 M board feet. The 46,081 M board feet were comprised of 2,843 M board feet of Douglas-fir, 1,221 of Western redcedar and Alaska yellow cedar, 300 of Western white pine, and 41,717 of Western hemlock and Pacific silver fir. Thus, the only type of timber which cut out in excess of the competitive bid volume was the Western hemlock and related species, and then only in the amount of 1,717 M board feet.

■ The undercutting of subject timber resulted from the inexperience of defendant's cruisers and their failure to allow sufficient deductions for defects in the overmature and decadent stands of timber involved, and the merchantable timber recoverable under the contract thus amounted to only 46,081 M board feet, rather than the contract volume of 73,100 M board feet. The evidence is insufficient to find that the undercutting of timber in this case was caused in whole or in part by variances between cruise techniques and cutting or scaling practices, such as pertaining to measurements of diameters and volumes of logs, and cutting lengths of logs as compared to log lengths used in cruising. The evidence does not establish that there was any substantial loss of timber by sinking of logs in water transportation or by breaking of logs at the water dump used by plaintiff, or by cutting practices employed by plaintiff's logging subcontractors.

It is my conclusion that the fair and just law applicable in the instant case is that restated and adopted by the American Law Institute and the National Conference of Commissioners of Uniform State Laws in their promulgation of the Uniform Commercial Code, widely enacted in the various states.

Section 2–313 of the Uniform Commercial Code, in its Sales Article, provides as follows:

> Section 2–313. Express Warranties by Affirmation, Promise, Description, Sample.
>
> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

The term "goods" is defined in Section 2–105 of the Code as including "growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2–107)." Section 2–107 states that a "contract for the sale of timber &ast; &ast; &ast; is a contract for the sale of goods" within the pertinent Sales Article of the Code if the timber is "to be severed by the seller."

Since the Tonga Ridge sale contract required that the buyer, not the seller, cut the timber from the land, it might be con-

cluded that subject contract is not within the scope of the above-quoted Section 2–313 of the Code. However, Comment 1 to Section 2–107 indicates that if the buyer is to sever the timber, the contract is deemed one affecting the land, and all problems of the Statute of Frauds and of the recording of land rights apply to it, rather than the Statute of Frauds pertaining to a contract for the sale of goods. Thus, the distinction between a timber sale contract in which the seller is to sever the timber and one in which the buyer does the cutting, is based solely upon the technical formal requirements of the Statute of Frauds relating to contracts for sale of goods, as contrasted with the one pertaining to transfers of interests in land. In the narrow context of determining the applicable law relating to the creation of warranties, there is no reason militating against the use of the above-quoted code standards in this case.

Reliance is placed upon the Uniform Commercial Code as stating applicable law for the reasons aptly stated by Circuit Judge Friendly in a case involving the issue as to whether or not a seller-manufacturer of electronic computer systems was excused from delivery of such equipment to the government. In considering the Code rule involved, Judge Friendly stated in United States v. Wegematic Corp., 360 F.2d 674, 676 (2d Cir. 1966), as follows:

* *. * * * *

We find persuasive the defendant's suggestion of looking to the Uniform Commercial Code as a source for the "federal" law of sales. The Code has been adopted by Congress for the District of Columbia, 77 Stat. 630 (1963), has been enacted in over forty states, and is thus well on its way to becoming a truly national law of commerce, which, as Judge L. Hand said of the Negotiable Instruments Law, is "more complete and more certain, than any other which can conceivably be drawn from those sources of 'general law' to which we were accustomed to resort in the days of Swift v. Tyson." New York, N. H. & H. R. Co. v. Reconstruction Finance Corp., 180 F.2d 241, 244 (2 Cir. 1950). When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States.

* * * * * *

■ It is concluded that a warranty of quantity of timber was extended to plaintiff by defendant in the subject contract of sale under all of the relevant facts and circumstances in evidence, based primarily on the cumulative effect of the following facts:

1. The contract prepared by defendant, is prospectus of sale, and its cruise and sale report, all available to plaintiff before bidding, all stated that there was a total of 73,100 M board feet of merchantable timber to be cut on the sale.

2. None of such documents, nor any other issued by defendant prior to the consummation of the sale, contained a disclaimer of warranty as to quantity, or any cautionary language to the effect that prospective purchasers should not rely on the defendant's cruise estimate.

3. The suggestion was made by the office of the Chief of the Forest Service to the pertinent regional office that a new contract form be used, which clearly negated any warranty of quantity. The regional office did not use the new form. Its personnel believed the cruise to be reasonably accurate.

4. The regional office also failed to implement the suggestion of the office of the Chief that accelerated road amortization provisions be included in the contract as originally prepared by defendant and executed by the parties. This is consistent with defendant's full confidence that the total contract volume of timber would be cut, and that the regular amortization provisions were adequate, i. e., that recoupment of road costs would be fully accomplished by spreading the recovery

over the entire volume of 73,100 M board feet indicated by the cruise report.

5. As required by defendant's prospectus, the competitive bidding proceeded on certain volumes of the various types of timber, and each bidder was required to submit a uniform bid on certain additional volumes of the various types. These volumes totaled 73,100 M board feet. Thus, it is clear that defendant, as well as plaintiff, relied upon the affirmation that there were 73,100 M board feet of merchantable timber as "part of the basis of the bargain."

6. It was the announced policy of the Forest Service that the determination of the timber volume to be cut from the sale areas "will be carefully made, since a prospective purchase should reasonably expect to base his operating plans and cost estimates on such figures," and that since the purchaser "estimates his development costs, operating costs, and returns on this estimated volume and quality" of timber to be cut in the sale offering, it is important "that there be good co-relation between Silvicultural prescriptions, marking guides, contract provision, appraisal and timber marking."

7. It was a practical impossibility under the circumstances for plaintiff or any other prospective purchaser to conduct an independent cruise of the timber offered for sale, in the rugged and snow-covered terrain involved. This fact was obvious to the Forest Service, which must have assumed that plaintiff and others would have to rely upon the accuracy of defendant's cruise. Plaintiff reasonably relied upon the accuracy of such cruise, and believed in good faith that 73,100 M board feet of merchantable timber would be cut under the contract.

8. The parties intended that all of the estimated costs of construction of the permanent road system would be recouped by plaintiff, and this could be accomplished, as the contract was originally drawn, only if the estimated volume of 73,100 M board feet was cut.

This analysis and the conclusion reached are fully consistent with and support-ed by the rulings of this court that material representations in the government's plans and specifications, upon which the contractor justifiably relies, in the absence of a caveat regarding verification of the facts represented, amount to a warranty, and the contractor is entitled to recover damages caused by the incorrectness of such representations, irrespective of the good faith with which they were made. In Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 699 (1964), cited with approval in Paccon, Inc. v. United States, 399 F.2d 162, 166–167, 185 Ct.Cl. 24, 31–32 (1968), the court stated:

> \* \* \* In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue. \* \* \*

Basically in dispute is the question of the legal effect of the words "more or less" employed by defendant in its prospectus and inserted in the contract form following the enumeration of the total volume of timber in the amount of 73,100 M board feet. In the consideration of such a technical issue, due regard must be given to the cardinal principle of contract construction that all relevant terms and circumstances of the agreement are to be considered.

In Brawley v. United States, 96 U.S. 168, 169, 24 L.Ed. 622 (1877), the Supreme Court affirmed the dismissal by this court of a claim for breach of contract, entered into by the claimant with the Quartermaster Corps, United States Army, in which claimant undertook to sell, furnish and deliver to a certain military post

> \* \* \* cut and split in lengths of four (4) feet \* \* \* eight hundred and eighty (880) cords of \* \* \* oak wood, more or less, as shall be determined to be necessary, by the post commander, for the regular supply, in

accordance with army regulations, of the troops and employees of the garrison of said post, for the fiscal year beginning July 1, 1871, and ending June 30, 1872. * * *

Forty cords of wood were delivered and paid for, after which further deliveries were refused, even though claimant was fully prepared to deliver 840 cords more.

Adverting to the doctrine of sale by specific lot, the Supreme Court at pp. 171–172 stated the governing rules as follows:

> Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of "about," or "more or less," or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.

> But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, "about," "more or less," and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.

The Court then held that the substance of the contract in issue was to furnish the number of cords of wood determined by the post commander in good faith for the regular supply for the fiscal year involved.

The subject sale does not fit the doctrine of sale of timber by specific lots or areas of land. It is sufficient to note that the terms of the contract in this case, and the circumstances preceding its execution, show that the defendant's representation that the timber volume was 73,100 M board feet was the basis of the agreement between the parties, upon which representation plaintiff reasonably relied, as expected by defendant.

Moreover, regarding the mention by the Supreme Court of land descriptions by natural boundaries, defendant's prospectus, cruise report, contract map and contract language failed to describe the boundaries of subject cutting areas with reasonable accuracy. In fact, the boundaries as eventually layed out, by tagging of trees by defendant prior to commencement of logging operations on each tract, varied considerably from the boundaries as indicated on the contract map. The contract map itself was far from precise, showing sketches of the irregularly shaped tracts within the land sections involved, and not involving any previous boundary surveys or tagging of trees by defendant. While geographical and physical facts were mentioned in defendant's cruise report, which permitted a prospective purchaser to determine some boundaries of some tracts with reasonable accuracy, other boundaries were lost in the extension of the forest over the general area. Such designation of boundaries cannot reasonably be held to be those "independent circumstances" mentioned by the Supreme Court, which would negate a clear understanding of the parties that the 73,100 M board feet were the quantity specified as material, governing the contract.

While not cited by either party, consideration is given to the decision and opinion of this court in Brock v. United States, 84 Ct.Cl. 453 (1937), in which a timber cutting contract stated that certain estimated volumes of various types

of timber were to be cut at specified rates from a 188-acre tract of land, which adjoined lands owned by plaintiff, on which he had conducted timber operations. The exact location of the contract tract was shown on a map attached to the contract. The timber estimates were based on a cruise conducted by defendant. The court applied the rule of sale by specific lot, citing and quoting from Brawley v. United States, *supra*.

The *Brock* case is clearly distinguishable from the subject case, as the facts therein show that such plaintiff was plainly not justified in relying upon defendant's estimates as to timber volumes involved, nor does it appear that the parties intended or expected that the estimated quantities would be the basis of the agreement between them, and thus a warranty was not made by defendant in the contract. It is significant that the court in the *Brock* case recognized the applicability of the warranty principle as stated in Dunbar & Sullivan Dredging Co. v. United States, 65 Ct.Cl. 567 (1928), i. e., that a positive statement of facts in specifications, upon which the contractor is entitled to rely, is binding upon the government, and upon it rather than upon the claimant must fall the loss resulting from a misstatement of such facts. 84 Ct.Cl. at 458, 65 Ct.Cl. at 567, citing Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914).

The effect of the failure to realize the estimated volume of timber, coupled with the rate redetermination provisions of the contract, was to increase plaintiff's expected overall average cost per M board feet. As was anticipated by the parties, the redetermined rates were generally lower than the contract rates, and thus the average price per M board feet would have been lower than the average contract rate, had the contract volume of 73,100 M board feet been cut. With the undercutting that occurred, plaintiff suffered damages on account of loss of stumpage, as a reasonably foreseeable result of defendant's breach of warranty, by failing to realize the advantages of the lower average rates which would have resulted.

As to each type of timber involved herein, plaintiff's damages for loss of stumpage are computed by first arriving at the average rate which plaintiff would have paid for each type of timber had the contract volume for that type been realized. For each type, this involves applying the contract rate to the competitive bid volume, applying the redetermined rate to the balance of the contract volume, adding the two products thus computed, and dividing such total by the contract volume, to arrive at the average rate per M board feet, which would have been paid on the contract volume. This average rate was then deducted from the contract rate actually paid, and the difference applied to the volume actually cut, to arrive at the excess payment on that type of timber, resulting from plaintiff's failure to realize the lower average rate contemplated.

This computation was repeated with respect to each type of timber, with appropriate adjustments on the Western white pine, due to the fact that the redetermined rate exceeded the contract rate, and on the Western hemlock and related species, to allow for the fact that this latter type cut out 1,717 M board feet in excess of the competitive bid volume.

Plaintiff's damages for loss of stumpage were thus computed in the total amount of $250,046, as shown in detail in finding 36.

Defendant's revised estimated cost of construction of the main roads was $539,600. This was the sum upon which the regular and accelerated road amortization rates were computed by defendant, and it was the intention of the parties that plaintiff would recoup this entire sum. While plaintiff's experienced costs would appear to have been as low as $484,750, the difference between that sum and defendant's revised estimate was due to the fact that plaintiff negotiated a favorable subcontract on road construc-

tion. This was fully known to the Forest Service when it made the revised estimate of road cost, and it was defendant's conclusion that plaintiff was entitled to the benefits of its favorable negotiations. Such is deemed the fair and just disposition of the matter by the court. Plaintiff recouped $351,382.26 of the estimated road costs. Accordingly, plaintiff's damages for failure to recoup the estimated road costs amount to $188,217.74, as computed in finding 37.

It is my opinion that plaintiff is entitled to recover, and that judgment should be entered for plaintiff in the total sum of $438,263.74.