## SUN SHIPBUILDING & DRY DOCK CO.

v.

## UNITED STATES LINES, INC.

### Civ. A. No. 75–2275.

United States District Court,
E. D. Pennsylvania.

Oct. 31, 1977.

Motion for Reconsideration Denied
Nov. 22, 1077.

John J. Runzer, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

Thomas Lane Anderson, Rawle & Henderson, Philadelphia, Pa., Russell T. Weil, Kirlin, Campbell & Keating, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

CAHN, District Judge.

## I. INTRODUCTION

Plaintiff Sun Shipbuilding and Dry Dock Company ("Sun") and defendant United States Lines, Inc. ("USL") have filed cross-motions for summary judgment. Plaintiff alleges that it is entitled to $926,617.17[1] in contract damages as well as substantial interest charges dating from January 1, 1966. Defendant contends that as a matter of law it has no further contract liability and that in any event plaintiff is not entitled to recover interest for any period prior to this court's final decision. I have concluded that plaintiff's motion should be granted and defendant's denied.

## II. FACTS

Plaintiff is a shipbuilding company. In late 1962, plaintiff entered into a tripartite agreement with defendant and the United States Maritime Administration pursuant to the Ship Construction Subsidy Program, 46 U.S.C. § 1101 et seq., to construct five cargo vessels. Under the contract, the Maritime Administration obligated the United States

Government to pay 48.6 percent of the contract price, and defendant agreed to pay the remaining 51.4 percent. Following a series of legal battles, the Government fully satisfied its obligation; only defendant's share is at issue in this case.

Under the terms of the contract, USL and the Government were entitled to order changes unilaterally in the construction of the vessels. The contract provided arbitration procedures for determining plaintiff's compensation for increased costs due to such modifications.[2]

Pursuant to these contract terms, USL ordered Sun to undertake two substantial changes in the construction of the ships. Sun diligently performed the necessary work. On November 24, 1965, two months after its delivery of the final vessel, Sun submitted a $5,000,000 claim for additional compensation. On November 13, 1967, the Division of Estimates found plaintiff's actual costs to be $1,700,000. On appeal, the Office of Ship Construction redetermined the costs and found them to be $2,200,000. An appeal by both parties to the Maritime Subsidy Board resulted in an increase of the plaintiff's compensation to $2,798,882.35 on September 24, 1971. Finally, on January 20, 1972, the Secretary of Commerce, upon consideration of another set of challenges by USL and Sun, again modified the award by increasing it to $3,070,547.95. Plaintiff appealed this award to the Court of Claims with respect to the Government's share. The Court of Claims affirmed the Secretary's decision on May 28, 1976.

During this entire period, Sun still had recovered no compensation from the defendant for the costs of the changes defendant had unilaterally ordered. Furthermore, USL has, to date, not paid its full share of the change costs which it concedes are

---

1. USL has stipulated that it is liable for a portion of this basic contract liability, see Sun Shipbuilding and Dry Dock Co. v. United States Lines, No. 75–2275 (E.D.Pa. June 27, 1977), but has denied liability for interest on that sum.

2. Under the contract and the Maritime Administration's procedures, plaintiff's added com-

pensation was to be one hundred ten percent of plaintiff's added costs. These costs were to be determined in the first instance by the Maritime Administration's Division of Estimates and the Office of Ship Construction. Those determinations were appealable to the Maritime Subsidy Board and thereafter to the Secretary of Commerce.

owed. Upon plaintiff's demand for payment in 1972, USL did offer to pay its share of the administrative award if plaintiff would waive its right to appeal the award of the Maritime Subsidy Board. But at no time after the Secretary of Commerce increased the award did defendant offer to satisfy plaintiff's full claim, along with the interest plaintiff alleged was due.

## III. ISSUES

Plaintiff's alternative claims raise several issues:

1. Is Sun entitled to prejudgment interest from January 1, 1966—a reasonable time after it submitted its final estimate of costs—on the full amount awarded?

2. If not, is Sun entitled to prejudgment interest from September 24, 1971—the date of the Maritime Subsidy Board's final award—on the full amount awarded?

3. Is Sun at least entitled to prejudgment interest from January 1, 1966, on the amount USL conceded was due?

Defendant's lengthy reply claims that no interest is recoverable because Sun's claim was not liquidated prior to the Secretary's decision and no prejudgment interest can be recovered on an unliquidated debt. USL also contends that the contract imposes no liability whatsoever on it until all "disputes" with respect to the contract are settled, and thus no interest can be charged prior to this court's final decision.

USL's cross-motion raises the following procedural issues:

1. Did a Court of Claims ruling concerning plaintiff's claims against the United States determine plaintiff's interest claim and thus estop the similar claim in this case? Alternatively, does Sun's presentation of its case to the Court of Claims operate as a waiver of Sun's interest claim in this action?

2. Is the United States an indispensable party to this action, such that this court cannot decide the issues before it unless the United States is joined?

3. Does Sun's failure to accept USL's payment offer in 1972 preclude any claim for interest?

USL also raises a number of substantive challenges to the award of the Secretary itself:

1. Did the Secretary err as a matter of law in awarding Sun compensation for delay costs?

2. Did the Secretary err as a matter of law in awarding Sun compensation for delay costs relating to delay occurring before the final contract due date?

3. Did the Secretary err as a matter of law in awarding in excess of three million dollars in view of the fact that USL relied on Sun's lower original estimate of costs?

## IV. INTEREST [3]

A. *Should Prejudgment Interest Be Awarded?*

■ Ordinarily the issue of whether prejudgment interest should be awarded to a claimant under a contract depends on whether the claim was liquidated or unliquidated at the time it was brought. The time when USL's debt became liquidated in this case—that is, when it was "finally" ascertained or capable of ascertainment with mathematical precision—is a matter which the parties have vigorously disputed.

■ The two rules for prejudgment interest are similar under Pennsylvania and federal law. If a claim is liquidated, the party whose payment or money has been withheld is entitled to prejudgment interest as a matter of right from the time the money became due or payable. *Eazor Express, Inc. v. Int'l Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir. 1975), *cert.*

---

3. The parties agree and I have decided in an earlier decision in this case that Pennsylvania law should be applied. *Sun Shipbuilding v. United States Lines,* p. 2 at n. 1, No. 75–2275 (E.D.Pa. Feb. 16, 1977).

**676**

*denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976); *Oxford Manufacturing Co. v. Cliff House Building Corp.*, 224 Pa. Super. 387, 307 A.2d 343 (1973). If, on the other hand, the claim is not mathematically ascertainable, prejudgment interest is ordinarily not allowed. However, the court, in its discretion, may in a particular case find that the equities of the circumstances demand an award of interest and may grant such an award as it deems proper. *Miller v. Robertson*, 266 U.S. 243, 258, 45 S.Ct. 73, 69 L.Ed. 265 (1924); *Cold Metal Process Co. v. United Engineering & Foundry Co.*, 235 F.2d 224, 231 (3d Cir. 1956); *Prudential Insurance Co. v. City of Philadelphia*, No. 73–1109 (E.D.Pa. Oct. 24, 1975), *aff'd*, 547 F.2d 1163 (3d Cir. 1977); *Marrazzo v. Scranton Nehi Bottling Co., Inc.*, 438 Pa. 72, 74–5, 263 A.2d 336 (1970).

■ In this case, I believe that the equities demand an award of prejudgment interest on the entire amount USL owes Sun. Accordingly, I do not need to reach the issue of whether and when Sun's claim was reduced to a liquidated sum.[4]

Under the contract, Sun undertook to provide USL with five vessels. As discussed below, the contract contemplated that Sun be compensated as the work progressed. Streamlined arbitration procedures for disputes were provided so that payment could be made promptly. Sun performed its obligations fully and diligently. Even when substantial mid-construction changes were ordered by USL, work pro-

ceeded rapidly and delivery of the vessels was delayed by only a short period. Furthermore, although Sun could have submitted estimates of "change-costs" on a monthly basis and could have reasonably expected prompt progress payments to be made (see Contract, Cl. IV(a)[5]), it chose instead to await completion and delivery of the vessels before demanding payment. The record discloses no substantial complaints by the Government or USL about the quality of plaintiff's products.

In strict contrast to plaintiff's professional attitude toward the contract and in clear violation of the spirit of the agreement, the Government and USL acted to delay compensating plaintiff for its work. Sun submitted its final estimate of costs to the Maritime Administration's Division of Estimates on November 24, 1965. Despite the contract's clear mandate for a prompt decision, the Division failed to rule for nearly two years. The first internal appeal resulted in another delay of nearly two years. The final internal appeal to the Maritime Subsidy Board was not ruled upon until nearly six years had elapsed from the date of Sun's submission of costs.

It is significant to note two facts. First, Sun's compensation was to be one hundred ten percent of *costs*, illustrating that long before it even requested compensation, Sun had spent most of the money it claimed on USL's behalf. Second, although USL had ordered Sun to make those expenditures, it never offered to reimburse Sun pending the

---

4. There is substantial precedent for the proposition that claims for work done pursuant to a clause providing for postponed cost-determination are liquidated. In *Ring Construction Corp. v. United States*, 209 F.2d 668, 673 (8th Cir. 1954), the Government sued under the Renegotiation Act, 50 U.S.C.A. Appendix § 1191, to recover "excessive profits" paid the defendant under a wartime contract. Like USL in this case, defendant claims that its debt would not be "final" or "liquidated" until the final court determination of the excessive profits. The Eighth Circuit Court of Appeals disagreed, holding:

'sums due the U.S. upon renegotiation of contracts are clearly debts . . . Interest therefore runs from the date upon which the contractor fails to make repayment, after

proper notice.' . . . This is true even though the liability is unilaterally determined. *Cf. Swartzbaugh Manufacturing Co. v. United States*, 289 F.2d 81, 84 (6th Cir. 1961). Similarly, in *Gloeckler v. Imrie*, 118 Pa.Super. 441, 445, 179 A. 883 (1935), defendant counterclaimed for reasonable compensation for "extra work" performed under the contract. Replying to plaintiff's contentions that such a claim was not liquidated, the Pennsylvania court held that where the claim arises "under a contract claiming a definite amount", interest was due from the date of completion of the contract. *Cf. Oxford Manufacturing Co. v. Cliff House Building Corp.*, 224 Pa.Super. 387, 389, 307 A.2d 343 (1973).

5. Pertinent clauses of the contract are reproduced in the Appendix to this Opinion.

outcome of the lengthy arbitration; indeed, as late as 1977, USL still refused to reimburse Sun for a large portion of the amount USL *conceded* it owed, retaining the investment and other financial benefits of the money it withheld. A less stable company than Sun would undoubtedly have been unable to withstand the financial strain imposed upon it by the actions of the Government and USL. In view of these facts, I conclude that the equities in this case weigh heavily in plaintiff's favor, and I have therefore exercised my discretion to award prejudgment interest to Sun.

At least three courts of appeals, including the Third Circuit Court of Appeals, have upheld the discretionary right of a district court to award prejudgment interest under the circumstances presented in this case. In *United States v. Bethlehem Steel Corp.,* 113 F.2d 301 (3d Cir. 1940), *aff'd,* 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1941), a shipbuilder sued to recover compensation from the Government and from a private corporate defendant under a form of "cost-plus" shipbuilding contract. The amount of compensation, by definition, was determined after completion of construction. The Court of Appeals held that the claim was unliquidated. Nevertheless, it found that under Pennsylvania law "the allowance of interest prior to judgment was discretionary with the district court" and "should be governed by equitable principles". *Id.* at 308.[6]

In *Dunlap v. Warmack-Fitts Steel Co.,* 370 F.2d 876 (8th Cir. 1966), a construction contractor sued for compensation for "extra work" not included in the contract. Without ruling on the defendants' contentions that this claim was unliquidated, the court held that prejudgment interest should be awarded from the time the plaintiff demanded payment for the extra work. *See also Gloeckler v. Imrie,* 118 Pa.Super. 441, 179 A. 883 (1935).

Finally, in *Swartzbaugh Manufacturing Co. v. United States,* 289 F.2d 81, 85 (6th Cir. 1961), the plaintiff made a contract with the Government under which prepaid compensation was to be "redetermined", based on actual costs, upon completion of plaintiff's work. The Government determined that it had overpaid, and plaintiff undertook a series of appeals from that determination. In response to the Government's demand for interest from the date of the unilateral redetermination, plaintiff asserted that its debt was unliquidated until a final court decision on its appeals. The Sixth Circuit Court of Appeals upheld the district court's discretionary award of interest, stating:

> No equitable principle was offended by the allowance of interest in the case at bar. Plaintiff had the use of, and withheld, the government's money for the period for which it was required to pay interest.

*See Ring Construction Corp. v. United States,* 209 F.2d 668 (8th Cir. 1954). *Cf. Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp.,* 311 F.2d 389, 399 (4th Cir. 1962).

In this case, USL has had the use of Sun's money for twelve years. At simple six percent interest,[7] the accrued interest over that period on USL's share of the final award exceeds one million dollars. To hold under the circumstances of this case that Sun is not entitled to an accounting and interest for the sum withheld would be an abuse of my discretion.

### B. From When Should Prejudgment Interest Be Awarded?

Having determined that prejudgment interest should be awarded from the time USL's debt was payable and demanded, I must now determine when that time occurred. USL contends that Clauses IV(d)(ii) and 4(e) of the contract require me

---

6. The district court in *Bethlehem Steel,* however, denied interest on the ground that the contract was virtually unconscionable, and thus the equities in the case did not lie with the shipbuilder.

7. Under Pennsylvania law, six percent is the applicable interest rate in contract-related claims. *Miller v. Reading,* 369 Pa. 471, 87 A.2d 223 (1952).

to find that no change costs are payable until all disputes concerning those costs are finally adjudicated. Alternatively, USL apparently contends that Sun has not yet properly demanded payment or at best demanded payment by its 1972 invoices. I disagree.

The scheme of the contract is designed to prevent undue delay of construction because of negotiations pertaining to change orders. Therefore, the contractor is required to proceed with its work diligently. Cl. 4(e), Article 36. In exchange, the contractor is entitled to receive compensation of one hundred ten percent of the change costs and to receive the bulk of that compensation in the form of progress payments as the necessary work develops. Cl. IV(a)(ii). The entire contract contemplates parallel action by the parties; Sun is to continue to work diligently, while USL and the government are to make prompt payments.[8] The contract protects the Government and USL from excessive payment by permitting them to withhold five percent of the amount due until final delivery and, possibly, for a period thereafter. Cl. IV(a)(ii), Cl. IV(b), Cl. IV(d). Article 14 of the contract clearly shows that it is intended to provide a formula whereby all transactions among the parties are completed within one year of delivery of the final vessel. This contractual scheme would be nullified were I to permit USL to withhold payments without paying interest for twelve years.[9]

When, then, was compensation "payable" and "demanded"? As I interpret the contract, Sun would have been entitled under Cl. IV(a) to submit monthly demands for progress payments relating to change costs. The Board and USL, for their part, would have been required to act promptly on those demands. In the event of a dispute, the parties were required to submit to the arbitration of the Office of Ship Construction, Article 36, and the arbitrator was to decide reasonably promptly. In view of the Article 14 expectation that transactions be completed within one year, the contract evidently presumed that a prompt decision meant no longer than that period.

Sun chose not to follow those procedures until November 24, 1965, two months after work on the vessels had been completed. Therefore, until that time Sun made no demand for payment. Sun's submission of its final estimate on November 24, however, put USL on notice of the amount Sun claimed. USL received a copy of the estimate. Had USL offered payment at that time, Sun would certainly have given it a full release and all transactions between the parties would have ceased. Thus, although Sun did not mail USL a formal invoice because it was abiding by Maritime Administration procedures, I find that its submission of the estimate constituted a demand for payment on USL.

I now consider when the demand became "payable."[10] As noted above, the

8. Examples of clauses which mandate prompt action by USL and the Government abound. Article IV requires progress payments. Clause XII(b), dealing with contractor initiated changes, requires that "the Owner and the Board shall make every reasonable effort to expedite its analysis of any value engineering proposal." Clause 4(e) states that the Board must "*as soon as practicable*" act on the contractor's estimate and that the decision must be forwarded to the contractor "promptly".

9. Were I to accept USL's position, I would be holding that the "owner" under the standard contract at issue in this case would be entitled to enter an objection to payment, pursue dilatory appeals through the entire administrative and judicial process, and in the interim retain the amounts due, interest free. To illustrate

that such a hypothesis is not far-flung speculation, I note that, with the exception of Sun's appeal to the Court of Claims (regarding the government's debt), USL entered a cross-appeal to each of Sun's appeals.

10. Defendant contends at p. 15 of its Memorandum in Support of its summary judgment motion that I am bound, in deciding when Sun's demand became payable, by a Court of Claims decision which allegedly held that USL's debt was not "finally determined" by the final administrative decision of the Maritime Subsidy Board. Without reaching the merits of the res judicata argument, I find that the issue considered by the Court of Claims has no relevance to these proceedings. The Court of Claims was considering only the issue of whether the decision was final such that USL

contract contemplates submission of the dispute to the Office of Ship Construction and also contemplates a final decision by that Office within a reasonable time, not to exceed one year. That decision would serve to render the demand "payable" for the first time, even though the decision was subject to appeal. *Cf. Weldon & Kelly Co. v. Pavia Co.,* 354 Pa. 75, 46 A.2d 466 (1946); *Lackawanna Iron & Steel Co. v. Lackawanna & Wyoming R.R.,* 299 Pa. 503, 149 A. 702 (1930). In this case, the decision was not entered until three years and nine months later. This delay, not the "fault" of the plaintiff, was excessive under the contract.

Since the contract contemplated a shorter period, I find that plaintiff's demand should be deemed to have become payable within a reasonable time of Sun's submission of the estimate. In this case, one year would have been the maximum "reasonable" time for the initial administrative decision. Accordingly, interest should be awarded from November 24, 1966.[11]

## V. USL'S AFFIRMATIVE DEFENSES TO THE INTEREST AWARD

Defendant raises a number of affirmative defenses to Sun's interest claim. All of these defenses are without merit.

USL contends that Sun raised the interest question in its action in the Court of Claims and that the court decided against such an award by permitting Sun to dismiss the counts demanding interest against USL. USL argues that this decision bars an award of interest at this time. USL further contends that the Maritime Subsidy Board's finding—that until a final Board decision on Sun's estimate was rendered,

Sun's claim was unliquidated and therefore could bear no interest—should also operate to bar our award under the principles of res judicata.

 With respect to the Court of Claims decision, it is significant to realize that the court had no jurisdiction to rule upon Sun's claims against USL and had no jurisdiction to award interest against the United States. 28 U.S.C. § 2516(a). USL was joined as a party in that action only so that it might protect its own interest while aiding the court in ruling upon Sun's claims against the Government. *Cf. National Cored Forgings Co. v. United States,* 115 F.Supp. 469, 473, 126 Ct.Cl. 250 (1953). As noted above, Count I of Sun's complaint in the Court of Claims had no relevance to the issue of Sun's right to interest against USL; it dealt only with the issue of whether USL had *defaulted* to the extent that the Government would be required to satisfy USL's obligations. In Count II, Sun sought an increase in the award against the United States. Since the Court of Claims was without jurisdiction to award Sun interest against the United States, it did not with regard to this count decide, nor did it ever hear argument on, the interest issue vis-a-vis USL. While under some circumstances proceedings in the Court of Claims may have a res judicata effect in subsequent district court proceedings, see *Petrovich v. United States,* 421 F.2d 1364, 190 Ct.Cl. 760 (1970); *Bowser, Inc. v. United States,* 420 F.2d 1057, 190 Ct.Cl. 441 (1970), and *Miller v. United States,* 438 F.Supp. 514 at 519–524 (E.D.Pa.1977), the court in this case cannot have intended to rule on the issue

had defaulted by refusing to make payments pending further appeals. Even if the court by its dismissal of Count I of Sun's complaint did hold that USL had not defaulted, that decision in no way determines that USL should not be liable for interest on the debt it in fact owed.

11. In determining that the "arbitrator's" delay was unreasonable and that plaintiff should not be penalized for it, I note that here there was no totally "impartial" arbitrator. The arbitrating office was a division of the very governmental agency responsible for paying the Government's share of Sun's estimate. Since

Sun can collect no interest on the Government's share, 28 U.S.C. § 2516(a), the arbitrator certainly had no interest in rendering a speedy decision.

I emphasize that interpreting the contract as I have imposes no undue hardship on USL. Throughout this period, USL had the use of the money owed to Sun and was able to receive interest on it. To hold now that USL must turn over a reasonable amount of interest for the period during which it possessed the money is not inequitable.

and to bar our decision here. *See Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 844 (3d Cir. 1974) (identical issue must have been decided); *Brown v. United States,* 508 F.2d 618, 621 (3d Cir. 1974), *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975) (issue must have been actually decided); *Lynne Carol Fashions, Inc. v. Cranston Print Works,* 453 F.2d 1177, 1183 (3d Cir. 1972) (issue must be necessary to first litigation).[12]

■ Nor does the Maritime Board's decision that Sun's claim was unliquidated bar our award. The facts regarding the payment procedures that were employed are not disputed. The Board's decision that the claim was unliquidated was a decision of law, not of fact. Furthermore, its determination that a finding of nonliquidation required it to deny interest constituted a second decision of law. *Cf. Oxford Manufacturing Co. v. Cliff House, Building Co., supra,* 224 Pa.Super. at 390, 307 A.2d 343. My review of these decisions and subsequent determination that Sun should be awarded interest regardless of whether its claim was liquidated or not merely overrules the board on a legal matter with respect to which I may reach my own conclusions. *Sea-Land Service, Inc. v. United States,* 493 F.2d 1357, 1361, 204 Ct.Cl. 57, *cert. denied,* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1975); *Moore-McCormack Lines, Inc. v. United States,* 413 F.2d 568, 188 Ct.Cl. 644 (1969).

■ USL next contends that its tender of payment in 1972 should preclude any award of interest at least from that date. Under Pennsylvania law, a *sufficient* tender may stop the running of interest. *Appeal of Vandergrift,* 80 Pa. 116, 118 (1875); *Beth-June, Inc. v. Wil-Avon Merchandise Mart, Inc.,* 211 Pa.Super. 5, 11, 233 A.2d 620 (1967); 12 P.S. § 1072. The tender must, however, include interest and must be paid into court if refused. *Englehart v.*

*Cassatt,* 305 Pa. 117, 120–1, 157 A. 256 (1932); 12 P.S. § 1073. Most important, the tender must be unqualified. *See Coleman v. Quaker State Coca-Cola Bottling Co.,* 331 F.Supp. 785, 787 (E.D.Pa.1971). Here, USL's tender satisfied none of these requirements; it neither included interest, nor was paid into court, nor was unqualified in view of the fact that it required Sun to abandon its contentions that additional payments were owing. Under these circumstances, Sun's tender cannot be deemed "sufficient" to stop the running of interest on its debt.

■ Finally, USL claims that Sun's action should be dismissed pursuant to Fed.R. Civ.P. 19 for failure to join the United States as an (indispensable) party. This contention borders on the frivolous. The United States has no interest in these proceedings. Following the Court of Claims decision, the United States satisfied its entire obligation to Sun; Sun and the Government have no further quarrel. Joinder of the Government is not necessary to preserve USL's interest vis-a-vis Sun's claims. USL is able to raise in these proceedings any legal defense it deems appropriate. Should USL succeed in any of its legal contentions, its debt to Sun can be appropriately reduced. To the extent that a dispute between USL and the Government exists, the Government is, apparently, satisfied to settle that dispute in a separate action brought by USL in the District of Columbia. That suit, however, has no bearing on the issues before the court here.

## VI. DELAY COSTS

Quite apart from the question of interest, USL alleges that the Secretary's final award to Sun was excessive as a matter of law in three regards: first, that Sun is not entitled to recover "delay costs" resulting from USL's change orders; second, that even if Sun may recover some "delay costs"

---

**12.** USL also contends at p. 20 of its Memorandum in Support of its motion for summary judgment that to the extent Sun failed to press its prejudgment interest claim in the Court of Claims, Sun waived the claim. Since the Court

of Claims had no authority to award interest against USL, it would have been futile for Sun to pursue the matter there. Its failure to do so cannot be construed to be a waiver.

it may not recover those corresponding to delay prior to the final delivery date under the contract; and third, that Sun's final claim unreasonably exceeds Sun's initial estimate of costs and the award must therefore be reduced.

### A. Delay Costs Generally

The first allegation presents the court with an extremely difficult task of contractual interpretation. In *United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), the Supreme Court interpreted a government contract with the following clause relating to change costs:

> If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made . . . .

The Court held that this language provided alternative but mutually exclusive remedies for the plaintiff subcontractor's damage due to a government-initiated delay in performance; that is, the subcontractor's own time for performance could be extended *or* delay costs could be recovered, but not both. USL argues that the contract language in *Rice* is so similar to Articles IV and 4 of the Sun contract as to require a similar interpretation.

■ The parties correctly have presented this issue of contractual interpretation to me as a question of law. However, in view of the Maritime Administration's experience with the standard contract at issue

here, I will give great weight to its decision rejecting USL's contention.[13] *See United States v. American Trucking Assoc., Inc.,* 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Sea-Land Service, Inc. v. United States, supra,* at 1361.

■ I am persuaded that the Maritime Board's interpretation of the contract is correct and that Sun is entitled to be compensated for all costs resulting directly from USL's change orders. Clauses 4(d) and 4(e) specifically provide for recovery costs due to delay. Unlike the terms in the *Rice* contract, a separate provision deals with time extensions, *see* Article 5, clearly suggesting that the remedies are not mutually exclusive. The Maritime Subsidy Board correctly determined that Clause 4(d)'s provision for compensation for increases "in the cost of the contract work" should be interpreted to encompass all costs, including those associated with delay.[14]

The facts of *Rice* as well as the contractual language therein are distinguishable from those in the case at bar. In *Rice,* the subcontractor was prevented from *commencing* work at the appointed time because the Government's change order delayed completion of the general contractor's work. Since it had not yet begun, and since no additional work was ultimately required of the subcontractor, the Court specifically held that it was equitable to permit an extension to complete work as the exclusive

---

**13.** The *Rice* case has not met with favorable reaction by the Court of Claims in recent years, and there is serious doubt whether it would be upheld in full by the Supreme Court today. *See, e. g., Paul Hardeman, Inc. v. United States,* 406 F.2d 1357, 1362, 186 Ct.Cl. 743 (1969); *Law v. United States,* 195 Ct.Cl. 370, 432 (1971). *See also* Shedd, The Rice Doctrine and the Ripple Effects of Changes, 32 Geo.Wash.L. Rev. 62 (1963); Note, The Rice Doctrine After Twenty-five Years: Bloody but unbowed, 39 Colo.L.Rev. 533 (1967). In view of that fact and the Maritime Administration's belief that *Rice* should not apply, I am constrained to read the case narrowly under the circumstances before me.

**14.** The United States, both in the administrative proceedings and in the Court of Claims,

conceded this to be the proper interpretation of the contract. As Sun points out at length in its Memorandum in Support of its motion, at 22, this interpretation is further supported by the policy announced by the Federal Maritime Board in the early 1960's to reimburse contractors for change costs by paying for the changes at the price the contractor would initially have bid had he known of it. *Sun Shipbuilding & Dry Dock Co. v. United States,* 393 F.2d 807, 810, 183 Ct.Cl. 358 (1968). These payments would necessarily have included delay costs. Although this policy was no longer in effect at the time the Sun contract was signed, it should have put USL on notice that express language in the contract was necessary if the Rice doctrine was intended to apply to it.

remedy. *Cf. United States v. Foley Co.,* 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946), explaining *Rice* and *H. E. Crook Co. v. United States,* 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438 (1926). In our case, Sun had already begun work and USL ordered it to change the plans in mid-stream. Sun's delay costs accrued directly from the change orders, and could not have been avoided by any foresight on Sun's part. Under these circumstances, unlike in *Rice,* it would be inequitable to deny Sun recovery for them.[15]

### B. *Pre-Deadline Delay Costs*

■ The parties do not seriously contest that, absent USL's change orders, Sun would have delivered the vessels fifteen days prior to the deadline and that because of those orders it was unable to do so. Furthermore, for purposes of these motions, it is uncontested that Sun suffered costs associated with that delay. Since I have determined that the contract entitles Sun to recover delay costs generally, the issue of whether Sun is entitled to recover pre-deadline delay costs is easily settled.

The only substantive defense which USL has raised is that *United States v. Blair,* 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1940), precludes such a recovery. In *Blair,* the Government contracted with two contractors. The general contractor, Blair, was given four hundred twenty days to complete construction of a building but planned to complete construction within three hundred fourteen days. The other contractor, however, delayed its work and consequently forced Blair to use the entire four hundred twenty days. Blair attempted to hold the Government liable for his delay costs because it failed to terminate the second contractor's contract promptly and to hire a third contractor so as to enable Blair to proceed. The Court denied liability, holding:

[N]othing in the Government construction contract used in this case imposed an obligation or duty on the Government to aid respondent in completing his contract prior to the stipulated completion date and [that] it was error for the court to award damages to respondent based upon a breach of this non-existent obligation.

321 U.S. at 733, 64 S.Ct. at 822.

*Blair* is inapposite to this case. In *Blair,* the delay was caused by a third party on whom Blair knew he was dependent at the time he signed the contract. Absent a contract clause imposing liability upon the government for such delay, it was proper for the Court to find that Blair had assumed the risk. In this case, Sun's damages were caused directly by USL's actions taken with Government approval. USL exercised its option to order changes and, unlike in *Blair,* the contract required it to bear their cost. Costs due to delay are no less damaging merely because they occur fortuitously before a contract deadline rather than after. Since the contract explicitly provides that such costs are recoverable, USL cannot avoid liability for them. *Cf. Metropolitan Paving Co. v. United States,* 325 F.2d 241, 163 Ct.Cl. 420 (1963).

### C. *The Estimate*

■ USL contends that because the Secretary's final award to Sun exceeded Sun's preliminary estimate by 81.6 percent, it is unreasonable and excessive as a matter of law. USL cites no case in which a court has overturned such an award as excessive as a matter of law absent some form of deception, fraud, or negligence. No wrongdoing is evident in this case. Indeed, the hearing examiner found that Sun proposed a fixed price for the changes, thus accepting the risk of an error in estimating costs, but that USL rejected that proposal. USL

---

**15.** This distinction, furthermore, supports Sun's position on how the contract should be interpreted. It would be unlikely that any contractor would knowingly subject itself to the risk of personal liability for delay costs due to changes ordered unilaterally by the other party to the contract or that the government would sanction such an unconscionable requirement in its standard contract form. Thus, it is reasonable to assume that Article 4 of the contract was designed to avoid that result. As noted in the Maritime Board's Final Decision, Sun Exhibit F, at 27, this interpretation of the standard contract has been consistently applied.

Exhibit 3. *Cf. Everett Plywood and Door Co. v. United States,* 419 F.2d 425, 433, 190 Ct.Cl. 80 (1969). While I do not hold such an award can never be excessive as a matter of law, I see no reason to disturb the Secretary's finding in this case that $3,070,-547.95 is reasonable. *Cf. Brawley v. United States,* 96 U.S. 168, 24 L.Ed. 622 (1877).

## VII. CONCLUSION

I have found that Sun is entitled to prejudgment interest from November 24, 1966. In view of that decision, I do not reach the issues of whether interest should be awarded, on different grounds, from the date of the Maritime Subsidy Board's final order or whether interest should be awarded only on the amount USL at all times conceded was due.

## APPENDIX A

### I. PERTINENT "GENERAL PROVISIONS" OF THE CONTRACT.

Article 4. (b) The Owner, with the approval or authorization of the Board, may direct any change in the Plans and Specifications effecting a deduction from or an addition to the contract work set out therein within the general scope thereof; provided, however, if a directed change in the Plans and Specifications affects a specific guarantee set out in the Specifications or in the Special Provisions and such effect is noted by the Contractor in its estimate of the change the guarantee will be modified to the extent determined by the Board. The Contractor shall proceed promptly with all changes authorized or directed by the Owner, and approved or authorized by the Board, as provided in this Article 4; provided, however, if the Board determines that the performance of the increased work incident to a major change will subject the Contractor to damages from the consequent delay of other work of the Contractor then under contract, the Contractor shall not be required to proceed with such additional work unless the Owner agrees to pay to the Contractor such damage costs as determined and approved by the Board.

(c) In connection with the consideration of a proposed change in the Plans and Specifications initiated by the Owner, the Owner may request (if the proposed change makes a major change in the Plans and Specifications such request shall be approved by the Board) the Contractor to submit to the Owner the Contractor's preliminary estimate of the change in cost, weight, moments and centers and delay in delivery of the vessel which estimate shall be accompanied by a full description of the completed work which would be eliminated or would have to be modified, or acquired material which would not be used if the change is approved and of the effect, if any, of the proposed change on any guarantee of the Contractor under this contract and if the change is a major change the damage cost referred to in 4(b) above. Said preliminary estimate shall be submitted to the Owner within the time determined by the Board to be reasonably required for the preparation of such estimate. The Owner and the Board shall consider such preliminary estimate. Within a reasonable time the Contractor shall be directed to proceed by the Owner, as approved by the Board, or shall be advised by the Owner that the proposed change will not be directed. In the event the proposed change is not directed, and the Board determines that the change proposed was a major change in the contract work, the Contractor shall be reimbursed for the engineering and estimating costs involved, as determined by the Board.

(d) Promptly and within a reasonable time, as determined by the Board, after receipt of directions from the Owner, as approved or authorized by the Board, to make a change in the Plans and Specifications, or authorization by the Owner as approved or authorized by the Board of a change in the Plans and Specifications, requested by the Contractor, the Contractor shall furnish to the Owner, in writing, a statement of its detailed estimate of the net increase or decrease in the cost of the contract work and probable delay in delivery of the vessel to result from such change.

(e) The Owner shall transmit such statement to the Board which shall consider the Contractor's statement and on the basis thereof and on the basis of such other evidence as the Board may deem relevant shall, as soon as practicable, approve or disapprove the Contractor's estimate. The Owner shall promptly notify the Contractor of the Board's approval or disapproval of the Contractor's estimate. Notwithstanding a dispute in connection with the Contractor's estimate of the cost of a change, the Contractor shall, nevertheless, proceed promptly with the work covered by such directed or approved change. One hundred and ten per cent (110%) of the net increase in estimated cost, if any, resulting from all change cost estimates, as approved or as finally determined, shall be added to the contract price as an adjustment thereof. In the event of a net decrease in contract cost in the total of all such cost estimates the Contract Price shall be reduced by the amount of such net decease.

Article 5. *Extension of Time.*—(a) In case of any delay caused by the Owner, by the Board, or by any other agency or instrumentality of the United States, or by any one or more of them, or in the case of the occurrence of any cause of delay reasonably beyond the control of the Contractor, . . written notice thereof and of the anticipated effect thereof, when knowledge thereof has come to the Contractor, shall be given promptly by the Contractor to the Owner. Within twenty (20) days (or such longer period as the Owner may allow) after such cause of delay has ceased to exist, the Contractor shall furnish to the Owner a statement of the actual delay resulting from such cause. The Owner shall submit the Contractor's statement to the Board together with any information and comments it deems relevant for the Board's use in determining whether such delays were caused by any cause set out in this Article 5(a).

(b) On the basis of the statements and information furnished to the Owner by the Contractor, which the Owner shall transmit to the Board, in regard to change in delivery as provided in paragraph (a) of Article 4 of these General Provisions and as provided in paragraph (a) of this Article 5, and on the basis of such other evidence as the Board shall deem relevant, the Board shall determine the number of days that the date provided in the Special Provisions for the contract delivery date of the vessel shall be advanced or extended by reason of a change in Plans or Specifications or caused by a cause set out in paragraph (a) of this Article 5, excepting, however, any delay resulting from a cause of delay in effect as of the date of the opening of bids under which this contract was awarded; provided, however, that no extension of contract delivery date shall be granted on account of the delay of subcontractors (including material suppliers) unless such delay was due to causes beyond the control of the subcontractor including the specific causes enumerated in paragraph (a) of this Article 5, excepting any delay resulting from the continuation of a cause of delay in effect as of the date of the subcontract award, where the Board determines that the Contractor had notice of the subcontractor's cause of delay prior to or at the time of subcontractor's award (other than a cause of delay which the Board determines to be industry-wide).

(c) The determination of any and all extensions of time for delivery of the vessel provided for in paragraph (b) of this Article 5 shall be postponed, without prejudice to the rights of the Contractor or the Owner, until the vessel has been delivered, provided, however, the Board on its own initiative or upon request of either the Contractor or the Owner may grant an extension of contract delivery date prior to delivery of a vessel.

Article 6. *Liquidated Damages for Delay in Delivery.* In the event the Contractor fails to deliver the vessel on or before the contract delivery date provided in the Special Provisions, as said contract delivery date may be extended pursuant to Article 5 of these General Provisions, the Owner and the Board will suffer damages which are difficult of ascertainment, so that it is agreed by the Contractor and the Owner and the Board that the sum set out in the Special Provisions as the per-day liquidated

damages represents the damages to the Owner and the Board for each day of delayed delivery, and the Contractor shall pay to the Owner and the Board in discharge of its obligation to the Owner and the Board for its failure to deliver the vessel on the contract delivery date as such date has been extended pursuant to the provisions of this contract, as liquidated damages and not as a penalty, the said sum as per-day liquidated damages, for each calendar day or part thereof elapsing from the contract delivery date until the delivery date of the vessel. The payment of such liquidated damages shall not affect any other rights or remedies of the Owner or the Board hereunder as to matters other than the date of delivery. Such liquidated damages shall not be considered as an allowable item of cost in the determination of profit under the provisions of Article 15 of these General Provisions.

Article 14. *Guarantee Period—Liability for Defective Work or Material.*—(a) Notwithstanding any inspection or failure to reject by the Owner or any regulatory body pursuant to Article 9 of these General Provisions, if at any time within six (6) months after the delivery of the vessel any weakness, deficiency, failure, breaking down or deterioration in workmanship or material furnished by the Contractor in performing the contract work (herein called "defective workmanship" or "defective material") shall appear or be discovered, such defective workmanship or defective material shall be made good, at the Contractor's expense, to the requirements of the Plans and Specifications and of this contract; . . . In computing the guarantee period from the date of the Owner's acceptance of the completed vessel there shall be excluded any time the vessel is prevented from entering or is taken out of service on account of any defective workmanship or defective material for which the Contractor is responsible, as herein provided.

(b) The Owner shall notify the Contractor of any defective workmanship or defective material or damage for which the Contractor is liable pursuant to paragraph (a) above, discovered or appearing within the guarantee period within twenty (20) days of the end of such period or if the vessel is at sea at the end of such period within twenty (20) days of the end of the voyage. . .

(c) A final guarantee survey of the vessel shall be conducted by the Maritime Administration's Guarantee Survey Board at the expiration of the guarantee period, or as soon thereafter as the Owner shall deem practicable, but not later than six (6) months after the expiration of such guarantee period. Such survey shall be based on the defective workmanship and defective material in the contract work appearing or discovered during the guarantee period. In the event that the vessel is not available for the guarantee survey on or before the end of the guarantee period, the Owner promptly shall submit a list of all the defective workmanship and defective material in the contract work appearing or discovered during the guarantee period, to the Board with a copy to the Contractor. Such survey shall be held at such port in the United States as the Owner designates and seven (7) days' written notice of time and place for such final guarantee survey shall be given to the Contractor by the Owner.

Article 36. *Disputes.*—Any action, omission, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction, of the Maritime Administration, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor and to the Owner, which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days from the date of receipt of such copy the Contractor or the Owner appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction, a written appeal addressed to the Board. The decision of the Board on any question of fact, unless determined by a court of competent jurisdiction to have been fraudulent, capricious, or arbi-

trary, or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence, shall be final and conclusive and shall bind all the parties to this contract. In connection with any appeal proceeding under this Article 36, the Contractor and the Owner shall be afforded an opportunity to be heard before the Board or before the duly authorized representative or representatives of the Board appointed for the hearing of said appeal and an opportunity to offer evidence in support of or in opposition to the appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract work and in accordance with the decision of said Chief, Office of Ship Construction. The fact that the Owner, with or without comment, refers to the Board as hereinbefore provided, the Contractor's estimates as to the cost and time of making changes, shall not prejudice the rights of any party to have any dispute relating thereto decided under this Article 36.

## II. PERTINENT "SPECIAL PROVISIONS" OF THE CONTRACT

ARTICLE IV. *Payment of Contract Price.* (a) Progress payments on account of the Contract Price, adjusted as herein provided, shall be made to the Contractor by the Owner and the Board as the contract work progresses. The amounts of such payments shall be determined substantially in accordance with the usual Board practice of dividing the Contract Price into points representing the estimated cost of labor and material of the various components of the Contract Price and measuring such progress by the per cent of completion of said portions of the Contract Price as attested by representatives of the Board, the Owner and the Contractor. Such progress payments shall be made at monthly intervals, or at such other intervals as the parties agree, as follows:

 (i) The Board shall pay the Contractor forty eight and six tenths per cent (48.6%) and the Owner shall pay the Contractor fifty one and four tenths per cent (51.4%) of that portion of each progress payment on account of the Contract Price set out in Article I(a) hereof (excluding, however, the sum of Ninety Thousand Five Hundred Dollars ($90,500.) of the Contract Price for the National Defense features incorporated in the Vessels).

 (ii) The Board shall pay the Contractor forty eight and six tenths per cent (48.6%) and the Owner shall pay the Contractor fifty one and four tenths per cent (51.4%) of that portion of each progress payment on account of the net increase in Contract Price, pursuant to Article 4 of the General Provisions, for changes in the contract work approved by the Board as eligible for construction-differential subsidy; provided, however, in the event there is a net decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner and the Board pursuant to this Article IV shall be reduced by the respective percentages of such net decrease.

 (iii) The Board shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment on account of Ninety Thousand Five Hundred Dollars ($90,500.) of the Contract Price set out in Article I(a) hereof for the National Defense features incorporated in the Vessels.

 (iv) The Board shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment on account of the net increase in the Contract Price, pursuant to Article 4 of the General Provisions, for changes in the Plans and Specifications of the National Defense features; provided, however, in the event there is a net decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Board pursuant to this Article IV

shall be reduced by the amount of said net decrease.

(v) The Owner shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment covering increases in the Contract Price pursuant to Article 4 of the General Provisions hereof on account of changes of the Owner approved by the Board but not approved as eligible for construction-differential subsidy provided, however, in the event there is a decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner shall be reduced by the amount of such decrease.

(b) The aggregate of the progress payments provided in (a) above shall not be in excess of:

(i) Ninety-five per cent (95%) of the value (as represented by the Contract Price set out in Article I(a) hereof) of the work performed and materials delivered to the Shipyard for the construction of the Vessels (subject, however, to the provisions of paragraph (c) of this Article); plus

(ii) Ninety-five per cent (95%) of any cumulative net increase in Contract Price pursuant to Article 4 of the General Provisions, as of the date of said partial payment; or minus

(iii) Ninety-five per cent (95%) of any cumulative net decrease in Contract Price determined pursuant to Article 4 of the General Provisions, as of the date of said partial payment.

(d) The amounts withheld under the provisions of paragraph (b) of this Article (IV) plus any other amounts payable to the Contractor under the terms the Contract shall be paid as follows:

(i) One-half of the amount so withheld as to each Vessel, except the last Vessel, shall be payable promptly after the delivery of such Vessel.

(ii) The remaining one-half of the amount withheld as to each Vessel, except the last Vessel, shall be paid promptly upon completion of the final guarantee survey of such Vessel held pursuant to Article 14(c) of the General Provisions of the Contract, less, however, any amount required by the Board to be withheld as additional security to protect the Owner and the Board with respect to all remaining contractual obligations of the Contractor, including the cost of remedying any remaining delivery or guarantee deficiencies and any disbursements by the Owner pursuant to Article 14 of the General Provisions, and neither the Contractor nor anyone claiming through the Contractor shall have any claim against such withheld amounts unless and until such obligations and guarantee deficiencies are remedied. The Owner and the Board may apply such withheld amounts towards the payment of or reimbursement for the expense of fulfilling such contractual obligations and remedying such deficiencies and the Contract Price and progress payments shall be adjusted and satisfied accordingly. Any amounts remaining of such deductions after remedying such deficiencies shall, however, be thereafter payable progressively promptly as such obligations and deficiencies are settled, except with respect to the last Vessel.

(iii) All other amounts payable to the Contractor pursuant to this Contract shall be paid by the Owner and the Board within thirty (30) days after (a) the Owner has notified the Board that all delivery and guarantee obligations have been satisfied, and (b) the Board has determined that all disputes and all claims under the Contract have been settled or finally adjudicated,

and has also determined the final contract price.

(e) No payments shall be made except on bills, vouchers, or invoices submitted in such number or form and executed and attested in such manner as shall be prescribed by the Owner with the approval of the Board.

Article XII

(b) The Owner and the Board shall make every reasonable effort to expedite its analysis of any value engineering proposal submitted by the Contractor within the times set out in the Specifications, provided, however, the Owner and the Board shall have no liability to the Contractor under this Contract or otherwise for any delay in taking action upon a value engineering proposal submitted by the Contractor or for any failure to take action upon any such study or recommendation.

ARTICLE XIV. *Modifications to General Provisions.* The General Provisions referred to in Article I hereof are modified as follows:

(a) Add the following at the end of Article 14(b):

"Within 30 days after such determination has been communicated to the Contractor, the Contractor, if it disputes the determination, shall submit the determination to the Chief, Office of Ship Construction, of the Maritime Administration, as a dispute for decision by such Chief, Office of Ship Construction, with the right of appeal to the Board, all as provided in Article 36 hereof."

ON MOTION FOR RECONSIDERATION

AND NOW this 22nd day of November, 1977, upon consideration of defendant's Motion for Reconsideration, IT IS ORDERED that the motion is DENIED.

This court's Order was entered on November 1, 1977. Defendant's notice of intention to file its motion was served on November 15, 1977. Defendant's motion is therefore barred by Fed.R.Civ.P. 58, which requires motions to alter or amend judgments to be filed within ten days after entry of the judgment.

Even if defendant's motion is not barred, the contention contained therein is without merit. This court's Order of February 16, 1977, held only that the statute of limitations did not bar plaintiff's cause of action because plaintiff was not capable of commencing suit in the federal courts until arbitration procedures were completed. That decision in no way precluded my subsequent finding that defendant's debt was due and payable prior to the completion of administrative arbitration. Nor is it inconsistent with my ruling that the equities of this case demand payment of interest on defendant's debt for the period during which the administrative award was being determined.